**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, )<br> )<br> ) Civil Action No. 12-333 (GK)<br> Plaintiff, )<br> )<br> v. )<br> )<br>U.S. DEPARTMENT OF HOMELAND SECURITY )<br> )<br> Defendant. )<br>_____)| |

**DECLARATION OF JAMES V.M.L. HOLZER, I, IN SUPPORT OF DEFENDANT'S MOTION FOR RELIEF FROM THE COURT'S ORDER OF MAY 24, 2012**

I, James V.M.L. Holzer, I, declare and state as follows:

1. I am the Director of Disclosure and FOIA Operations for the Department of Homeland Security (DHS) Privacy Office. In this capacity, I am the Department official immediately responsible for responding to requests for records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (the FOIA), the Privacy Act, 5 U.S.C. § 552a (the Privacy Act), and other applicable records access provisions. I have been employed by the DHS Privacy Office (DHS Privacy) in this capacity since May 2011. I make the following statements based upon my personal knowledge, which in turn is based on a personal review of the appropriate records in the case file and coordination with relevant FOIA personnel established for processing the subject request and upon information furnished to me in the course of my official duties.

2. Through the exercise of my official duties, I have become familiar with the background of plaintiff's FOIA request and DHS's search for responsive records. I have also

become familiar with the background of this litigation and have read a copy of the complaint filed by plaintiff.

3. The purpose of this declaration is to provide the Court and plaintiff with an overview of DHS's efforts to respond to plaintiff's FOIA request and to explain why additional time is required to complete the review and processing of potentially responsive documents before non-exempt records can be produced to plaintiff. For the reasons that will be discussed below in greater detail, DHS is submitting this declaration in support of its motion to modify the Court's scheduling order.

## RECEIPT AND INITIAL PROCESSING OF THE FOIA REQUEST

4. EPIC submitted a FOIA request to DHS on July 26, 2011, seeking records related to the Defense Industrial Base Cyber Pilot—called the "DIB Cyber Pilot" for short.

5. EPIC's request letter cited a June 16, 2011 *Washington Post* article that quoted remarks made by Deputy Defense Secretary William J. Lynn III at a global security conference in Paris. The letter requested the following documents:

> a) "All contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or other defense contractors regarding the new NSA pilot program;"
>
> b) "All contracts and communications with AT&T, Verizon, and CenturyLink or any other [Internet Service Providers] regarding the new NSA pilot program;"
>
> c) "All analyses, legal memoranda, and related records regarding the new NSA pilot program;"
>
> d) "Any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the new NSA pilot program;"
>
> e) "Any privacy impact assessment performed as part of the development of the new NSA pilot program."

6. EPIC's request letter incorrectly asserted that "no public name has been given" to the DIB Cyber Pilot. In fact, Deputy Defense Secretary Lynn referred to the DIB Cyber Pilot by name during his remarks at the global security conference in Paris. Secretary Lynn stated:

> [L]ast month, the Department of Defense, in partnership with the Department of Homeland Security, established a pilot program with a handful of defense companies to provide more robust protection for their networks. In this Defense Industrial Base -- or DIB -- Cyber Pilot, the Defense Department is sharing classified threat intelligence with defense contractors or their commercial internet service providers along with the know-how to employ it in network defense. By furnishing network administrators with this threat intelligence, we will be able to strengthen the existing cyber defenses at defense companies.

7. The Defense Industrial Base ("DIB") Sector is the worldwide industrial complex that enables research and development, as well as design, production, delivery, and maintenance of military weapons systems, subsystems, and components or parts, to meet U.S. military requirements. The DIB includes Department of Defense components and defense-industry companies who perform under contract to the Department of Defense.

8. The DIB Sector is a critical component of our national infrastructure. The DIB Sector provides products and services that are essential to mobilize, deploy, and sustain U.S. military operations. In recent years, as the United States' reliance on information technology has grown, Department of Defense and DHS leaders have recognized that the DIB Sector—like other important national infrastructure sectors—faces a dangerous, growing threat of cyber intrusion, exploitation, and attack. For example, as noted by Deputy Defense Secretary Lynn during his cyber security remarks in Paris, a foreign intelligence agency in 2008 used a thumb drive to penetrate United States classified computer systems. Current cyber security threats include the threat of theft of data from both government and commercial networks, the threat of disruption of communications networks that deny or degrade the use of important government or

commercial network, and the threat of destruction, where cyber tools may be used to cause physical damage.

9. The DIB Cyber Pilot was a joint effort by DHS and the Department of Defense to enable the provision of cybersecurity capabilities enhanced by U.S. government information to protect critical defense industrial base information systems and networks. The purpose of the pilot was to evaluate the potential to enhance the cybersecurity of participating DIB critical infrastructure entities and to protect sensitive information and DIB intellectual property that directly supports national defense missions from unauthorized access, exfiltration, and exploitation. During the DIB Cyber Pilot, DHS and the Department of Defense shared classified threat and technical information with participating DIB companies and internet service providers, in order to enhance the companies' capabilities to safeguard Department of Defense information that resides on, or transits, computer systems operated by DIB companies. The DIB Cyber Pilot involving internet service providers was completed and announced as a permanent program known as the DIB Enhanced Cybersecurity Services (DECS) on May 2012. *See* www.defense.gov/news/d20120512dib.pdf.

10. On August 3, 2011, DHS Privacy acknowledged EPIC's FOIA Request, which it assigned file number DHS/OS/PRIV 11-1104. DHS Privacy indicated that the agency had conducted a search and been unable to identify or locate any records responsive to category 5 of EPIC's FOIA Request (category (e) above). DHS Privacy notified EPIC of the right to appeal this determination and that it had referred EPIC's FOIA Request to the DHS National Protection and Programs Directorate ("NPPD" or "the Directorate") for further processing and direct response.

11. Although the original FOIA request in this matter was sent directly to DHS Privacy, this office referred the request to the National Protection & Programs Directorate (NPPD) FOIA Office for processing since the documents requested were most likely to be located within NPPD offices. NPPD is a component within DHS that works to advance the Department's risk-reduction mission. NPPD includes four subcomponents: the Office of Infrastructure Protection, the Federal Protective Service, the Office of U.S. Visitor and Immigrant Status Indicator Technology, and the Office of Cybersecurity and Communications (CS&C). CS&C is particularly relevant here because it has the mission of assuring the security, resiliency, and reliability of the nation's cyber and communications infrastructure.

12. The NPPD FOIA Office is responsible for the processing of FOIA requests received directly from the general public as well as FOIA requests referred by DHS Privacy, other DHS components, and other agencies. The NPPD FOIA Office processes FOIA requests as they are received, generally on a first-in, first-out basis. When DHS Privacy sent the referral to NPPD, NPPD had approximately 180 pending FOIA requests ahead of plaintiff's request.

13. On January 5, 2012, EPIC transmitted via facsimile a purported administrative appeal to NPPD's FOIA Office, appealing NPPD's non-responsiveness to categories 1-4 of EPIC's FOIA Request (categories (a)-(d) above). Prior to receiving EPIC's facsimile, NPPD FOIA had tasked out the search to CS&C and there had been discussions between NPPD and CS&C regarding the appropriate way to proceed with the FOIA Request given the broad scope. During January of 2012, a FOIA Specialist with NPPD spoke with EPIC by telephone and discussed the status of the FOIA request, indicating that it was being processed.

14. Plaintiff filed this litigation on March 1, 2012. DHS answered on May 1, 2012.

**NPPD'S SEARCH**

15. The NPPD FOIA Office processes FOIA and Privacy Act requests for the Office of the Under Secretary at NPPD and the four subcomponents of NPPD. The NPPD FOIA Office has one FOIA Officer; that individual also serves as the Executive Secretariat, manages the Directorate's records management program, and provides liaison services for all audits by the Office of Inspector General and the Government Accountability Office. The Office has a full time FOIA analyst and a full time FOIA Specialist. The NPPD FOIA Office works with NPPD subcomponents to conduct searches and provide responses.

16. When the NPPD FOIA Office receives a FOIA request, either directly or through a referral, NPPD FOIA personnel make a determination regarding which NPPD subcomponent or program office may have responsive documents, and then the FOIA personnel task those offices with searching for responsive records. The program offices must search for records while still marshaling their limited staff resources in a manner which maximizes their mission support activities. After the NPPD FOIA Office receives potentially responsive documents from the program offices, FOIA staff must conduct a review of the documents, redact information that is exempt under FOIA, refer records to other components or agencies that have equities in the records and coordinate with those other entities as necessary, and process the documents for release to the requester.

17. In the past three years, NPPD has seen a fivefold increase in FOIA requests. In 2009, NPPD received 58 FOIA requests; in 2010, NPPD received 155 FOIA requests; and in 2011, NPPD received 318 FOIA requests. At the beginning of 2012, the three employees of the NPPD FOIA Office were simultaneously working on responding to EPIC's FOIA request and hundreds of other FOIA requests.

18. The NPPD FOIA Office realized in early April 2012 that despite its continued efforts to coordinate the search for and produce records responsive to EPIC's FOIA request in a timely fashion, the process needed to be accelerated. To develop a renewed search plan, the NPPD FOIA Office met with subject matter experts who had been involved in the DIB Cyber Pilot and with DHS Office of General Counsel (OGC) attorneys. They identified the following NPPD subcomponents as most likely have responsive records, and tasked these offices with conducting electronic and physical record searches for potentially responsive documents:   a) the NPPD Office of the Under Secretary, including the Deputy Under Secretary and the Deputy Under Secretary for Cybersecurity; b) the NPPD Office of Privacy (NPPD Privacy); c) the NPPD Office of Cybersecurity & Communications (CS&C), which as noted above, is responsible for enhancing the security, resiliency, and reliability of the nation's cyber and communications infrastructure. They also crafted revised keyword searches to be used in electronically searching for responsive documents.

19. In addition to tasking the NPPD Office of the Under Secretary, NPPD Privacy, and CS&C with searches, NPPD provided the original FOIA request to the DHS Office of General Counsel and the Office of Selective Acquisitions (OSA) within the DHS Office of the Chief Procurement Officer for review and possible response. The Office of the Chief Procurement Officer is located within the office of the DHS Under Secretary for Management which is responsible for the DHS budget, appropriations, expenditure of funds, accounting and finance, and procurement, among other functions. OSA is responsible for overseeing the execution of classified procurements. The DHS Office of General Counsel (OGC) provided legal support to the project staff.

20. These five offices—the NPPD Office of the Under Secretary, NPPD Privacy, CS&C, OGC, and OSA—had just begun to conduct searches for potentially responsive records under the terms of the renewed search plan when the District Court held a status conference in this matter on May 24, 2012. At that time, DHS was unable to provide the Court with an estimate of the volume of potentially responsive documents that would require review; nor could DHS provide the Court with a reasonable estimate of how long it would require to complete the overall search, review, processing, and production of all non-exempt records responsive to EPIC's FOIA request. The Court adopted plaintiff's proposed schedule and issued a scheduling order setting August 24, 2012 as the deadline for defendant's complete production of documents and Vaughn index; September 24, 2012 as the deadline for defendant's motion for summary judgment; and October 24, 2012 as the deadline for plaintiff's opposition and cross-motion for summary judgment.

21. Following the Court's entry of its scheduling order, DHS diligently proceeded with its renewed search. The NPPD FOIA Office and Office of General Counsel continued to work with the NPPD Office of the Under Secretary, NPPD Privacy, CS&C, and OSA to ensure that sufficient searches were being conducted. DHS has three attorneys from OGC, including the Assistant General Counsel for Infrastructure Programs, assisting NPPD FOIA Office and other offices with the search. DHS also tapped the Office of the Chief Information Officer to assist with the searches, as the search included review of electronically archived documents.

22. DHS faced and continues to face significant logistical issues in conducting the search and review of potentially responsive documents because EPIC's FOIA request broadly seeks information that is located on both unclassified and classified information systems. Only persons with the proper security clearances could conduct the searches and review of the classified

records systems. Moreover, the physical locations of the information systems, potentially responsive documents, and Sensitive Compartmented Information Facilities (SCIFs) required for reviewing classified documents, are spread throughout the Washington, DC metropolitan area, including DHS Headquarters, Rosslyn and Arlington locations of NPPD.

23. Despite challenges of having to search both classified and unclassified information systems, locating archived material, and retrieving documents related to the complex pilot program, by the end of July, NPPD had gathered more than 16,000 pages of potentially responsive documents.

24. Faced with this very large volume of potentially responsive documents, DHS did three things:

25. One: DHS officials worked to identify additional personnel to assist NPPD with the remaining tasks required to process the potentially responsive documents, including coordinating with other agencies, conducting line-by-line reviews, redacting exempt material, and processing the non-exempt records for release. In early August 2012 the NPPD FOIA Office and OGC moved to maximize the use of available DHS FOIA resources and enhance the complex interagency coordination process for the large volume of records by requesting the additional assistance of DHS Privacy. The DHS Privacy Office's FOIA section is led by the Deputy Chief FOIA Officer at the Senior Executive Service Level, one of few Senior Executive Service career FOIA positions in the Federal government. In addition to the Deputy Chief FOIA Officer, there are three directors and nine Senior FOIA Program Specialists who process FOIA requests for the office. In addition to a greater number of FOIA staff, the DHS Privacy Office has access to more individuals with the necessary clearances to review and redact classified documents.

Recognizing that NPPD FOIA lacked the resources to process this volume of documents in a reasonable amount of time, DHS assigned DHS Privacy to assist with this FOIA.

26. Two: DHS contacted classification review specialists within DHS and the other agencies whose review of the potentially responsive documents would be required, to establish mechanisms for sharing the documents and to start to develop a timeline for review. Because many of the potentially responsive documents are located on a classified system, the documents remain presumptively classified and must be processed on classified systems until government officials with classification authority determine that all classified information has been removed or redacted and only non-classified, non-exempt information remains. DHS must rely on couriers with the appropriate clearances to courier documents to the SCIFs required for reviewing the classified documents, which, as noted above, are spread throughout the Washington, DC metropolitan area.

27. Three: DHS assigned a team of FOIA specialists and attorneys to review the documents that had been gathered to remove duplicates and weed out documents that had turned up because of DHS's electronic keyword search but plainly were not responsive to EPIC's request. DHS FOIA professionals and attorneys who had been assigned to the project spent several weeks reviewing the more than 16,000 pages of documents and culled them down to approximately 10,000 pages.

## **REQUIRED REVIEW AND PROCESSING**

28. The review of these potentially responsive documents began as soon as they were retrieved, however, as each day passed it became increasing apparent that more and more documents would require extensive consultation with other partnering agencies.

29. In late August, EPIC modified its FOIA request. The revised request now seeks the following, excluding draft documents: a) all contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or other defense contractors regarding the DIB Cyber Pilot; b) all contracts and communications with AT&T, Verizon, and CenturyLink or any other Internet Service Providers regarding the DIB Cyber Pilot; c) all legal and technical analyses, including legal memoranda, regarding the DIB Cyber Pilot; and d) any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the DIB Cyber Pilot.

30. The exclusion of draft documents from the scope of the request narrowed the volume of potentially responsive documents to approximately 9,200 pages of documents. Rephrasing the third category of the request from "all analyses, legal memoranda, and related records regarding the DIB Cyber Pilot" to "all legal and technical analyses, including legal memoranda, regarding the DIB Cyber Pilot" did not reduce the volume of potentially responsive documents that require review and processing.

31. Given the sensitive nature of the subject matter and the involvement of other agencies that use differing classification systems (i.e., Intelligence Community markings), each document must be reviewed line-by-line by DHS legal professionals and classification specialists before the FOIA professionals can apply the appropriate redactions.

32. It is now apparent that the majority of the documents will require consultation and/or referral to outside agencies before a final review of the responsive documents can occur. DHS FOIA practice requires referral where a request seeks records implicating national security that have been classified, or may be appropriate for classification under the applicable classification Executive Order, by another component or another agency.

33. Notwithstanding this diligent effort, any classified documents that may be responsive to plaintiff's FOIA requests are documents as to which access is tightly controlled pursuant to Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003), which sets forth the procedures for protecting information the unauthorized disclosure of which would cause harm to the national security of the United States.

34. In light of the classified nature of the potentially responsive documents, and, moreover, because plaintiff's request, on its face, seeks information that relates to collaborative national security efforts of multiple federal agencies it is highly likely that the vast majority of these documents will be exempt from disclosure under FOIA. *See* 5 U.S.C. § 552(b)(1). Nonetheless, DHS is committed to reviewing the potentially relevant classified documents to determine whether any non-exempt portions of them can be segregated and produced to plaintiff. Extraordinary care must be taken when processing documents of this sort to ensure that the constraints on the disclosure of classified information are properly observed, and that no inadvertent disclosure of classified information is made.

35. Classification review and consultation and referral procedures are critical to ensuring that classified information is not improperly disclosed, while at the same time identifying information that might properly be declassified and disclosed.

36. Despite all diligence by the Department, the potentially responsive documents, both classified and unclassified, cannot be processed within the time previously set by the Court. Extraordinary care which must be taken when reviewing potentially responsive documents of this sensitivity and the time that must be devoted to the classification reviews and consultations and referrals required by FOIA extends that process even further. Typical review of 9,000-

10,000 pages by DHS Privacy would normally take 5-6 months. The additional factors of classification reviews and referrals outside of DHS complicate that process on several levels. In addition to the work of actually reviewing and considering other agencies' analyses of appropriate classifications and redactions, the actual time it takes to physically deliver the documents to those agencies and receive them back is tripled. The review process must proceed in iterative steps—with DHS conducting its initial review and processing, other agencies conducting their review via referrals, and DHS conducting a final review and processing of records. Thus, the necessary time for review followed by referrals and consultations and then final review of the approximately 9,200 pages of potentially responsive documents is, realistically, a minimum of 16 months.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of September, 2012.

_____
James V.M.L. Holzer