**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) |
| Defendant. | ) ) ) |

Civil Action No. 12-0333 (GK)

**SECOND DECLARATION OF JAMES V.M.L. HOLZER**

I, James V.M.L. Holzer, I, declare and state as follows:

1. I am the Senior Director of FOIA Operations for the Department of Homeland Security (DHS) Privacy Office. In this capacity, I am the Department official immediately responsible for responding to requests for records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (the FOIA), the Privacy Act, 5 U.S.C. § 552a (the Privacy Act), and other applicable records access provisions. I have been employed by the DHS Privacy Office (DHS Privacy) in this capacity since November 2012. Prior to that, I held the position of Director of Disclosure and FOIA Operations. I have been with the Department since 2009. I make the following statements based upon my personal knowledge, which in turn is based on a personal review of the appropriate records in the case file and coordination with relevant FOIA personnel established for processing the subject request and upon information furnished to me in the course of my official duties.

2. Through the exercise of my official duties, I have become familiar with the background of plaintiff's FOIA request and DHS's response. I have also become familiar with

the background of this litigation and have read a copy of the complaint filed by plaintiff.  This is

the second declaration that I have provided in this matter.  My first declaration was executed

September 14, 2012 and submitted in support of defendant's motion to modify the scheduling

order.  (Document # 17-1.)  This declaration supports defendant's motion for summary

judgment.

## THE DEFENSE INDUSTRIAL BASE CYBER PILOT

3. The underlying FOIA request in this matter sought records related to the Defense

Industrial Base Cyber Pilot—called the "DIB Cyber Pilot" for short.  The DIB Cyber Pilot was a

joint effort by DHS and the Department of Defense to enable the provision of cybersecurity

capabilities enhanced by U.S. government information to protect critical defense industrial base

information systems and networks.

4. The Defense Industrial Base ("DIB") Sector is the worldwide industrial complex that

enables research and development, as well as design, production, delivery, and maintenance of

military weapons systems, subsystems, and components or parts, to meet U.S. military

requirements.  The DIB includes Department of Defense components and defense-industry

companies who perform under contract to the Department of Defense.

5. The DIB Sector is a critical component of our national infrastructure. The DIB Sector

provides products and services that are essential to mobilize, deploy, and sustain U.S. military

operations.  In recent years, as the United States' reliance on information technology has grown,

Department of Defense and DHS leaders have recognized that the DIB Sector—like other

important national infrastructure sectors—faces a dangerous, growing threat of cyber intrusion,

exploitation, and attack.  For example, as noted by Deputy Defense Secretary Lynn during his

cyber security remarks in Paris, a foreign intelligence agency in 2008 used a thumb drive to

penetrate United States classified computer systems.  Current cyber security threats include the threat of theft of  data from both government and commercial networks, the threat of disruption of communications networks that deny or degrade the use of important government or commercial network, and the threat of destruction, where cyber tools may be used to cause physical damage.

6. The purpose of the DIB Cyber Pilot was to evaluate the potential to enhance the cybersecurity of participating DIB critical infrastructure entities and to protect sensitive information and DIB intellectual property that directly supports national defense missions from unauthorized access, exfiltration, and exploitation. During the DIB Cyber Pilot, DHS and the Department of Defense shared classified threat and technical information with participating internet service providers, in order to enhance the ability of DIB companies to safeguard Department of Defense information that resides on, or transits, computer systems operated by DIB companies through cybersecurity services offered to DIB companies by the internet service providers.

7. The DIB Cyber Pilot involving internet service providers began as a DHS/DoD joint proof of concept with operational capabilities beginning around May 2011 and DHS assuming responsibility for the operational relationship with the internet service providers in approximately January 2012.  (See http://www.dhs.gov/xlibrary/assets/privacy/ privacy_nppd_jcsp_pia.pdf).  The DIB Cyber Pilot was completed and announced as a permanent program known as the DIB Enhanced Cybersecurity Services (DECS) on May 2012. *See* www.defense.gov/news/d20120512dib.pdf.

## RECEIPT AND PROCESSING OF THE FOIA REQUEST

8. On July 26, 2011, EPIC submitted a FOIA request to DHS that sought records related to the DIB Cyber Pilot; the request is included as exhibit 1 to this declaration.  *See* Tab A-1. EPIC's request described the pilot as "the new NSA pilot."  However, DHS later clarified with EPIC that EPIC was referring to, and seeking records regarding, the DIB Cyber Pilot.[1]  The FOIA request, as initially submitted,[2] sought the following documents: (1)  "All contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or other defense contractors regarding the new NSA pilot program;"  (2)  "All contracts and communications with AT&T, Verizon, and CenturyLink or any other [Internet Service Providers] regarding the new NSA pilot program;" (3)  "All analyses, legal memoranda, and related records regarding the new NSA pilot program;" (4)  "Any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the new NSA pilot program;" (5) "Any privacy impact assessment performed as part of the development of the new NSA pilot program."  EPIC's request is attached to this declaration as Exhibit A.

9. On August 3, 2011, DHS Privacy acknowledged EPIC's FOIA Request, which it assigned file number DHS/OS/PRIV 11-1104; the response is included as exhibit 2 to this declaration.  *See* Tab A-2.  DHS Privacy indicated that the agency had conducted a search and

---

[1] EPIC's request stated, incorrectly, that "no public name" had been given to the pilot program. The request also cited a June 16, 2011 Washington Post article that quoted remarks made by Deputy Defense Secretary William J. Lynn III at a global security conference in Paris. Deputy Secretary Lynn's comments described the "DIB Cyber Pilot" as follows:  "In this Defense Industrial Base -- or DIB -- Cyber Pilot, the Defense Department is sharing classified threat intelligence with defense contractors or their commercial internet service providers along with the know-how to employ it in network defense. By furnishing network administrators with this threat intelligence, we will be able to strengthen the existing cyber defenses at defense companies."

[2] After DHS conducted a search for documents and informed EPIC of the volume of potentially responsive documents, EPIC narrowed the scope of its request as outlined in paragraph 13 below.

been unable to identify or locate any records responsive to category 5 of EPIC's FOIA Request.

DHS Privacy notified EPIC of the right to appeal this determination and that it had referred

EPIC's FOIA Request to the DHS National Protection and Programs Directorate ("NPPD" or

"the Directorate") for further processing and direct response.  EPIC declined to appeal DHS's

determination with respect to category E.

10. DHS's August 3, 2011 response also notified EPIC that the DHS Privacy Office had

referred categories 1 through 4 of the request to the FOIA Office of DHS's National Protection

& Programs Directorate ("NPPD") for further processing and response since the documents

requested were most likely to be located within NPPD offices.

11. On January 5, 2012, EPIC transmitted via facsimile a purported administrative appeal

to NPPD's FOIA Office, appealing NPPD's non-responsiveness to categories 1-4 of EPIC's

FOIA Request (categories (a)-( d) above).  Tab A-3.  Prior to receiving EPIC's facsimile, NPPD

FOIA's Office had started to process the request by tasking out the search to the office that was

most directly responsible for DHS's involvement in the DIB Cyber Pilot, NPPD's subcomponent

the Office of Cybersecurity and Communications (CS&C).  NPPD FOIA Officials had also

engaged with CS&C officials regarding the appropriate way to proceed with the FOIA Request

given its potentially broad scope.  During January of 2012, a FOIA Specialist with NPPD spoke

with EPIC by telephone and discussed the status of the FOIA request, indicating that the

remaining four categories of the request were being processed.

12. Plaintiff filed this litigation on March 1, 2012, without waiting for DHS to complete

the administrative processing of the request.  DHS answered on May 1, 2012.

13. In the meantime, DHS continued with its processing of EPIC's FOIA request by

conducting the searches outlined below in paragraphs .  In August 2012, after DHS informed

EPIC that DHS had collected more than 10,000 pages of potentially responsive records, EPIC narrowed the scope of its FOIA request by excluding "draft documents" from the scope of its request and by narrowing Category 3 of the request.  Tab A-4.  EPIC's revised request sought, excluding draft documents:

> (a) all contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or other defense contractors regarding the DIB Cyber Pilot;
>
> (b) all contracts and communications with AT&T, Verizon, and CenturyLink or any other Internet Service Providers regarding the DIB Cyber Pilot;
>
> (c) all legal and technical analyses, including legal memoranda, regarding the DIB Cyber Pilot; and
>
> (d) any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the DIB Cyber Pilot.

*See id.*; *see also* Tab A-1.

### NPPD'S SEARCH

14. NPPD leads the national effort to protect and enhance the resilience of the nation's physical and cyber infrastructure.. NPPD includes four subcomponents:  the Office of Infrastructure Protection, the Federal Protective Service, the Office of Biometric Identity Management, formerly known as the Office of U.S. Visitor and Immigrant Status Indicator Technology, and the Office of Cybersecurity and Communications (CS&C). CS&C is particularly relevant here because it has the mission of assuring the security, resiliency, and reliability of the nation's cyber and communications infrastructure; it is the office that was most directly responsible for DHS's participation in the DIB Cyber Pilot.

15. When the NPPD FOIA Office receives a FOIA request, either directly or through a referral, NPPD FOIA personnel make a determination regarding which NPPD subcomponent or program office may have responsive documents, and then the FOIA personnel task those offices with searching for responsive records.  In this case, the NPPD FOIA Office met with subject

matter experts who had been involved in the DIB Cyber Pilot and with DHS Office of General

Counsel (OGC) attorneys. Together they identified the following NPPD subcomponents as most

likely have responsive records, and tasked these offices with conducting electronic and physical

record searches for potentially responsive documents:   a) the NPPD Office of the Under

Secretary, including the Deputy Under Secretary and the Deputy Under Secretary for

Cybersecurity ; b) the NPPD Office of Privacy (NPPD Privacy); c) the NPPD Office of

Cybersecurity & Communications (CS&C), which as noted above, is responsible for enhancing

the security, resiliency, and reliability of the nation's cyber and communications infrastructure.

NPDD did not search the offices of its other subcomponents, including the Office of Biometric

Identity Management, the Federal Protective Service, or the Office of Infrastructure Protection,

because those subcomponents did not have responsibilities for the DIB Cyber Pilot and thus

would be unlikely to have responsive records.

16. In addition to tasking the above-described NPPD subcomponents with searches,

NPPD provided the original FOIA request to the DHS Office of General Counsel and an office

within the DHS Directorate for Management, the Office of Selective Acquisitions (OSA) (which

is within the DHS Office of the Chief Procurement Officer in the Directorate for Management),

for review and possible response.  The DHS Office of General Counsel (OGC) provides legal

support to the Department, and had specifically supported the DIB Cyber Pilot project staff.

The Directorate for Management is responsible for the DHS budget, appropriations, expenditure

of funds, accounting and finance, and procurement, among other functions; its subcomponent

OSA is responsible for overseeing the execution of classified procurements, and NPPD thought

that OSA might have procurement-type records related to the DIB Cyber Pilot, such as contracts

and communications.

17. NPPD did not search other offices within the Directorate for Management, such as the Office of the Chief Financial Officer or the Office of the Chief Information Officer, because those offices did not have direct responsibilities for the DIB Cyber Pilot, and would not tend to have had records containing legal or technical analysis, or contracts or communications with the DIB companies or CSPs.  Similarly, NPPD did not search the DHS Office of the Secretary (although that office had initially been searched as described in DHS's August 2011 response letter to EPIC, *see* Tab A-2), the DHS Office of the Deputy Secretary, or other DHS components such as the Science and Technology Directorate or the Office of Policy, because those offices would not be likely to have records of legal or technical analysis that were non-duplicative from the records maintained by NPPD or OGC, or records of communications and contracts that were non-duplicative of NPPD or OSA.  In addition, NPPD did not search other Department components like the Transportation Security Administration (TSA), the Federal Law Enforcement Training Center, or the United States Coast Guard, etc., because those components did not likely have any connection to the DIB Cyber Pilot.

18. Working with the subject matter experts, NPPD FOIA also crafted keywords to be used in electronically searching for responsive documents.  The following keywords were provided to the NPPD components to use in the initial searches conducted in April 2012: Monitor + Defense contractors; Defense contractors + internet; DIB pilot; NSA Pilot; MOA + DHS + NSA; PIA + DIB; PIA + NSA; ISPs Monitor; Monitor Internet + NSA.  The following keywords were added in early May 2012: NSA pilot; NSA + [name of various DIB companies]; NSA + [name of various internet service providers]; NSA + Monitor + Internet; NSA + DHS + pilot; JCSP; DIB pilot; and DoD + pilot.

19. Each individual office and employee was instructed to conduct searches of his or her documents utilizing their knowledge of how and where they stored their own documents and records.  For example, employees that organized their documents topically into folders and subfolders had no need to run keyword searches and would retrieve their documents by going to the specified folder location.

### NPPD Office of the Under Secretary (OUS)

20. The NPPD OUS provides directorate leadership and coordinates activities throughout the Directorate.  The OUS is responsible for the management of all four subcomponent offices of NPPD.

21.   The NPPD FOIA Office determined that the OUS search would be best coordinated with the OUS Executive Secretariat (ExecSec).  OUS ExecSec is responsible for coordinating appropriate and expeditious action on tasks addressed to the Directorate.  It serves as the hub for coordinating, tracking, prioritizing, and responding to all tasks assigned to NPPD.

22. At the time of the records search, OUS ExecSec routinely used a Microsoft Access database of individual records ExecSec taskings.  Each database record contained a unique tracking number, description of the tasking, notations regarding the life cycle of a tasking, including information on who was tasked and links to the associated files which are saved on an ExecSec shared drive.  The database was searched using the key terms and supplemented by the ExecSec staff's general knowledge of the database and how documents and records were usually kept.  In addition to searching the database, the ExecSec staff searched the ExecSec shared inbox and classified information accounts of ExecSec staff members with classified information access.

23. NPPD FOIA worked with OUS ExecSec and program officials to identify key OUS staff and officials who were likely to have all the potentially responsive documents within OUS

including any incidental communication with other NPPD staff and officials.  Several key employees were identified as possibly in possession of potentially responsive documents. NPPD FOIA sent the identified OUS employees a tasking requesting that each employee conduct a search for potentially responsive records.  The search terms developed by NPPD FOIA that are listed in paragraph 17 were also provided to the appropriate employees.

24.  Potentially responsive documents were located and turned over to DHS Privacy for further processing.

### NPPD Privacy

25. The NPPD Privacy Office resides within the NPPD OUS.  The Privacy Office was identified as potentially possessing responsive documents, particularly regarding the Privacy Impact Assessment (PIA) and Privacy Threshold Assessment (PTA).

26. At the time of the search in April 2012, all NPPD Privacy employees searched their personal files, both electronic and hard copy, if applicable, and unclassified network files (*i.e.*, emails, internal drives, and shared drives) for responsive records.  A search was conducted on the classified network as well.

27. The searches were conducted using the search words provided by NPPD FOIA, as well as their personal knowledge of where and how they kept their documents and records on the DIB pilot.  The potentially responsive documents were compiled, duplicates removed, and forwarded to the NPPD FOIA office and then DHS Privacy for further action.

### NPPD Office Of Cybersecurity And Communications (CS&C)

28. CS&C is responsible for building and maintaining a national cybersecurity incident response system, implementing a cyber risk management program for protection of critical infrastructure, and planning for and providing national security and emergency preparedness

communications to the Federal government.  At the time of the search CS&C was comprised of four offices.  The National Cyber Security Division (NCSD) works collaboratively with public, private and international entities in risk assessment and threat/vulnerability reduction.  The National Cybersecurity and Communications Integration Center (NCCIC) serves as a centralized location where operational elements involved in cybersecurity and communications reliance are coordinated and integrated.  The National Communications System (NCS) assisted the President, the National Security Staff, and others in telecommunications functions and coordinating of national security and emergency preparedness communications.  The Office of Emergency Communications (OEC) provides support to emergency responders and government officials to facilitate their communication.

29. On or about April 12, 2012, the CS&C FOIA Liaison tasked NCSD (which included US-CERT) and NCCIC to search for documents potentially responsive to this request.  These offices were retasked with the additional search terms on May 08, 2012. NCS and OEC were not tasked as it was determined by CS&C that their communication related missions would not have been involved with the DIB Pilot program.

30. The individuals within the offices that conducted the searches determined where potentially relevant documents would be contained within systems based upon their particular knowledge of where and how they kept their documents and records on this subject.   The CS&C FOIA Liaison worked with the NPPD FOIA office to compile the documents that were received from NCSD, US-CERT, and NCCIC.

31. Responsive documents were located in personal files and, using the keywords outlined above in paragraph 16, computer systems searches were conducted on Unclassified (email, local drives, and shared networks) and Classified Local Area Networks (also including

email and shared drives). The classified networks include the Joint Worldwide Intelligence

Communication System (JWICS) and the Homeland Security Data Network (HSDN).

32. Potentially responsive documents were located and turned over to the DHS Privacy

for further processing.

## Search of the DHS Office of General Counsel

33. The DHS Office of the General Counsel (OGC) is responsible for providing legal

advice and making legal policy determinations within the Department and its components.

OGC is organized into ten divisions that align with the DHS component offices.   The National

Protection and Programs Legal Division (NPPLD) serves as counsel to the National Protection

and Programs Directorate, which is the parent component office of CS&C.  NPPLD  with

searching for documents potentially responsive to this request.

34. The NPPLD determined that two attorneys, the NPPLD Deputy Associate General

Counsel, and an attorney-advisor within the division would potentially have responsive

documents.   This determination was made based on specific attorneys that were assigned to

advise NPPD on the DIB program as subject matter experts.

35.   Both identified attorneys searched their records for potentially responsive records by

manually identifying the specific location within their email archives, physical hardcopy files,

and computer hard drives where they had stored all documents relating to the DIB program.

Both unclassified and classified email networks were searched by both attorneys.

36. The individuals that conducted the searches determined that all potentially relevant

documents would be contained within the individuals' physical hard copy files and agency email

systems based upon their particular knowledge of where and how they kept their documents and

records on this subject.

37. Information resided in emails and attachments to emails that each individual attorney archived in his or her own archive structure.  Both attorneys advised respectively that they stored their documents relating to the DIB program in a specific email archive folders and/or in their own physical hardcopy files.

38. Potentially responsive documents were located and turned over to the DHS Privacy for further processing.

**Search of the Office of the Chief Procurement Officer**

39. The Office of the Chief Procurement Officer (OCPO), resides as a subcomponent office of the DHS Undersecretary for Management.  The OCPO is responsible for effectively delivering mission capability through the contracting of critical supplies and services.   The OCPO serves as the principal contracting entity on behalf of NPPD and other components that do not have separate procurement offices.

40. Although participation in the DIB program by private entities was voluntary and it was not anticipated that contract documents would be located, out of an abundance of caution, NPPD determined that OCPO should be tasked with the search for this FOIA request.

41. Within the OCPO, classified and other sensitive contracts are handled by the Office of Selective Acquisitions (OSA).   The OSA was identified by NPPD to be the entity within OCPO that was most likely to have potentially responsive documents based on the classified and sensitive nature of the DIB program.

42. The OSA conducted a search based on several key terms.  A number of potentially responsive documents were located and provided to DHS Privacy for processing; however, the documents located by the OSA search were determined by DHS Privacy to be non-responsive to the FOIA request.

**Processing of Potentially Responsive Documents Returned by the Searches**

43.  By the end of July 2012, NPPD had gathered more than 16,000 pages of potentially responsive documents.  DHS assigned a team of FOIA specialists and attorneys to review the documents that had been gathered to remove duplicates and weed out documents that had turned up because of DHS's electronic keyword search but plainly were not responsive to EPIC's request. DHS FOIA professionals and attorneys who had been assigned to the project spent several weeks reviewing the more than 16,000 pages of documents and culled them down to approximately 10,000 pages.  These 10,000 pages were considered potentially responsive; they required more careful reading and review to identify which records/pages were actually responsive to the request.

44. Faced with this very large volume of potentially responsive documents, and recognizing that NPPD FOIA lacked the resources to process this volume of documents in a reasonable amount of time, DHS reassigned DHS Privacy to assist with this FOIA.

The DHS Privacy Office conducted page-by-page and line-by-line reviews of the potentially responsive documents to identify those records that were actually responsive to EPIC's revised request, described in paragraph 13, above.  DHS made every effort to segregate the exempt portions of the responsive records from the non-exempt portions of them. Extraordinary care was required when processing these documents to ensure that the constraints on the disclosure of classified and law-enforcement sensitive information were properly observed, and that no inadvertent disclosures of classified information were made.

45. On December 17, 2013, DHS Privacy issued its first interim response to EPIC, indicating that DHS had identified 494 pages of responsive materials that were being withheld in their entirety pursuant to Title 5 U.S.C. § 552 (b)(1), (b)(5), and (b)(7)(E) FOIA Exemption 1, 5,

and 7(E).  DHS later determined that the number of pages identified in this response was inaccurate because it included some number of pages of non-responsive documents in addition to the pages of withheld-in-full documents.

46. On April 15, 2013, DHS Privacy completed and produced to plaintiff its second final response, which consisted of 1,276 pages.  *See* Tab A-5.  Of those pages, DHS Privacy determined that 117 pages of the records were releasable in their entirety, 1,159 pages were partially releasable pursuant to Title 5 U.S.C. § 552 (b)(6), and (b)(7)(E), FOIA Exemptions 6 and 7(E).  DHS Privacy transmitted this response directly to the Department of Justice (DOJ) for handling in light of the current litigation.

47. Following its production of responsive documents, DHS made itself available to answer EPIC's questions regarding the production.  On June 20, 2013, EPIC sent DHS, through DHS's counsel, a list of documents that EPIC believed were missing from the production.  Tab A-6. My office reviewed the list of documents identified by EPIC and conducted a supplemental search, as described in the next paragraph.

48. DHS Privacy and NPPD culled through the collection of previously located "potentially responsive documents" that had been collected by the agency's searches and provided to DHS Privacy.  DHS Privacy and NPPD located all documents listed by Plaintiffs. Of the seventeen (17) documents identified by Plaintiffs as "missing", DHS confirmed that thirteen (13) of the documents were non-responsive to the FOIA request (based on the August 2012 revision to the scope of the request, Tab A-4) because they were either (a) draft documents or (b) otherwise non-responsive because they did not contain legal or technical analysis, communications or contracts with the DIB companies or CSPs, or deal with the subject matter of the DIB Cyber Pilot.  One (1) of the documents was one that DHS had previously determined to

be a draft document that was not responsive to EPIC's request. DHS Privacy reexamined the document during its supplemental search and determined that it should be considered to be a final document, responsive to the request; this document was supplementally released to plaintiff on August 16, 2013. Also during its supplemental search, DHS went back to the recipients or authors of the emails that had mentioned or attached the seventeen documents, to try to locate final versions of draft documents if final versions of the documents existed. Through this process, DHS located one (1) document for which it had had previously only located a draft version. That document was supplementally released to plaintiff on August 16, 2013. Three (3) of the seventeen (17) documents had been inadvertently excluded from the April 15, 2013 production; they were also supplementally released to Plaintiffs on August 16, 2013.

49. On August 16, 2013, DHS issued a supplemental response to EPIC's request. *See* Tab A-7. A total of 84 pages of records were provided to Plaintiffs. Of the 84 pages, 25 pages were rereleased documents from the April 15, 2013 production because DHS had determined to make certain additional discretionary releases of information. Fifty-nine pages of the response had not previously been provided to Plaintiffs, corresponding with the documents located and/or re-reviewed in the supplemental search and described in paragraph 49.

50. In total, DHS released 1,386 pages of documents, including some released in full and some released in part, and withheld in full 362 pages of documents.

## APPLICABLE FOIA EXEMPTIONS

51. Within the 456 documents that DHS released in whole or in part and the 26 documents that DHS withheld in full, DHS withheld information exempt from the FOIA pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(4), (b)(5), (b)(6), and (b)(7). The rationale of the DHS FOIA Office for withholding each particular category of information (except for information withheld

under Exemption 6, which plaintiff does not challenge) is set forth below, and in the

accompanying *Vaughn* Index (attached as an Appendix to this declaration).

## FOIA Exemption 1

52. DHS determined—after reviewing the DIB Cyber Pilot records and consulting with

other federal agencies, particularly with the National Security Agency ("NSA")—that certain

portions of the records were exempt under 5 U.S.C. § 552(b)(1) and must be withheld.

Exemption 1 protects information that is "(A) specifically authorized under criteria established

by an Executive order to be kept secret in the interest of national defense or foreign policy and

(B) [is] in fact properly classified pursuant to such Executive order".  5 U.S.C. § 522(b)(1).

Much of the information withheld pursuant to Exemption 1 consists of information withheld by

DHS on behalf of the National Security Agency (NSA); that information was primarily withheld

because it would reveal information about that agency's organization, functions, and activities,

which is protected from release primarily by FOIA Exemption 3 in conjunction with Section 6 of

the NSA Act of 1959, and 18 U.S.C. § 798, and is also protected from release by Exemption 1

because it is classified.  The information that was withheld as classified under Exemption 1 is

information that, if disclosed, would reveal classified details of NSA activities or would

otherwise reveal classified information as specified below and in the *Vaughn* index.

53. Records related to the DIB Cyber Pilot were created—and where necessary,

classified—between 2009 and 2012.  The classified documents therefore were classified under

either E.O. 13,292 or E.O. 13,526, depending on when each document was created.  Because the

pertinent sections of each Executive Order are not substantially different for the purposes of

DHS's Exemption 1 analysis, I will address only the current E.O. 13,526, which was the Order

that was in effect during the processing of the records when DHS, along with NSA and other federal agencies, conducted the segregability analysis.

54. The classified portion of the record collection in this case was withheld based on NSA's original classification authority.  E.O. 13,526 Part 1. Certain information that was reproduced, extracted, or summarized by DHS from materials classified by NSA or another federal agency was withheld based on DHS's derivative classification authority.  E.O. 13,526 Part 2.

55. DHS worked with other federal agencies including DOD and NSA to review the records that had been located on DHS's classified systems, to segregate information that could be released as unclassified, and to withhold information that remains properly classified.  David J. Sherman, Associate Director for Policy and Records at the National Security Agency, who serves as a TOP SECRET classification authority reviewed the NSA-related records in this case. Mr. Sherman determined that certain information within them meets the criteria for classification and is in fact currently and properly classified at the SECRET level in accordance with E.O. 13526. Working with NSA, my office segregated the unclassified or declassified information and released it, while withholding that information that is currently and properly classified.

56. According to E.O. 13,526, information may be considered for classification if "its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security" and if it pertains to one or more of eight specified categories of information.  _Id._ § 1.4.  In this case, certain information within the records is classified under one or both of two of the eight specified categories, namely the categories described in sub-sections 1.4(e) and 1.4(g).  The information in question reveals capabilities and/or vulnerabilities of systems relating to the national security, specifically electronic networks used by the defense

industrial base sector. Some of the information in question is also classified as pertaining to technological matters relating to the national security, namely cybersecurity operations of the federal government and defense contractors.

57. The unauthorized disclosure of the withheld classified information reasonably could be expected to cause identifiable or describable damage to national security.  Some of the information is classified as TOP SECRET because the unauthorized release of this information reasonably could be expeced to cause exceptionally grave damage to the national security, and some of the information is classified as SECRET the unauthorized release of this information reasonably could be expeced to cause serious damage to the national security.

58. The withheld classified information relates to vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services, as well as scientific and technological information regarding cyber security measures.  Release of the information would indicate to our adversaries the strengths and/or weaknesses of our systems.  Our adversaries could then either seek to exploit any identified weaknesses, or engage in countermeasures in order to reduce the effectiveness of said systems.  DHS also withheld certain information that would reveal how NSA conducts its mission; the disclosure of this operational information could reasonably be expected to cause serious damage to the national security by potentially jeopardizing certain activities that NSA undertakes in furtherance of its mission.

**FOIA Exemption 3**

59. On behalf of NSA, DHS also withheld information pursuant to Exemption 3.  Section 552(b)(3) of the FOIA provides that the FOIA does not require the release of matters that are specifically exempt from disclosure by statute, provided that such statutes: (A) require that the matters be withheld from the public in such a manner as to leave no discretion on this issue; or,

(B) establish particular criteria for withholding or refer to particular types of matter to be

withheld.  Review of the application of Exemption 3 statutes consists solely of determining that

the statute relied upon qualifies as an Exemption 3 statute and that the information withheld falls

within the scope of the statutes.

60. The redactions of information under Exemption 3 here consist primarily of employee

names, personally identifiable information, and telephone numbers, as well as information

relating to the NSA's internal processes, and activities, such as handling instructions for

classified information, activities, relationships, and our foreign partners.  Also redacted is

information that relates directly to NSA activities in relation to its Information Assurance

mission, and would reveal classified Agency activities in support of its mission.  That

information falls squarely within the scope of a statutory privilege unique to NSA.  As set forth

in Section 6 of the National Security Agency Act of 1959, Public Law 86-36 (50 U.S.C. § 402

note), "[n]othing in this Act or any other law . . . shall be construed to require the disclosure of

the organization or any function of the National Security Agency, [or] of any information with

respect to the activities thereof, or of the names, titles, salaries, or number of persons employed

by [NSA]." Further, NSA is not required to demonstrate specific harm to national security when

invoking this statutory privilege, but only to show that the information relates to its activities.  To

invoke this privilege, NSA must demonstrate only that the information it seeks to protect falls

within the scope of section 6.  NSA's functions and activities are therefore protected from

disclosure regardless of whether or not the information is classified.

61. DHS, after appropriate coordination with NSA, also made statutory redactions

pursuant to 18 U.S.C. § 798.  This statute prohibits the unauthorized disclosure of classified

information: (i) concerning the communications intelligence activities of the United States; or (ii)

obtained by the process of communication intelligence derived from the communications of any

foreign government.  The term "communications intelligence," as defined by 18 U.S.C. § 798(b),

means all procedures and methods used in the interception of communications and the obtaining

of information from such communications by other than the intended recipients.  Congress

enacted this statute to protect the fragile nature of NSA's SIGINT efforts, to include, but not

limited to, the existence and depth of signals intelligence-related successes, weaknesses, and

exploitation techniques.  This statute recognizes the vulnerability of signals intelligence to

countermeasures and the significance of the loss of valuable intelligence information to national

policymakers and the Intelligence Community.  Given that Congress specifically prohibited the

disclosure of classified information related to its communications intelligence activities, DHS,

after coordination with NSA, determined that NSA's SIGINT activities and functions, and its

intelligence sources and methods would be revealed if certain of the withheld information was

disclosed.

62. Because disclosure of the NSA information described above is prohibited by statute, I

determined that it has been properly withheld as exempt from disclosure pursuant to Exemption

3 of the FOIA.

**FOIA Exemption 4**

63. Exemption 4, 5 U.S.C. § 522(b)(4), protects "trade secrets and commercial or

financial information obtained from a person [that is] privileged or confidential."  DHS asserted

the (b)(4) exemption for certain commercial information contained in contract documents that is

protected by trade secret and commercial or financial information obtained from a person that is

privileged or confidential.

64. Participation by DIB companies and CSPs in the DIC Cyber Pilot was voluntary, and the information provided by these companies to the government was also done on a voluntary basis.  The declaration provided by Mark H. Herrington, Associate Deputy General Counsel in the Office of General Counsel, Department of Defense, describes the basis for the Exemption 4 withholding of certain DIB company information, including their identities.  Generally speaking DHS did not withhold the identities of the CSPs on an Exemption 4, but DHS did withhold the names if the context of the released information would reveal proprietary information about the CSPs that is of a kind that the CSPs would not customarily release themselves.  In that situation, DHS withheld identifying information in order to divorce the company's identity from the information that was released so that the substance of the information could be released and the companies' anonymity could be respected.

## FOIA Exemption 5

65. Exemption 5, 5 U.S.C. § 522(b)(5), allows for the withholding of intra-agency documents that are normally privileged in the civil discovery context. The deliberative process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within interagency or intra-agency memoranda or letters. The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.

66.  Specifically, as detailed in the accompanying Vaughn index, DHS applied this exemption to protect the contents of inter and intra-agency email communications that revealed the predecisional discussions of senior agency and DHS program office personnel.   Exemption 5

was also applied to protect attorney-client privileged communications and legal advice provided by DHS counsel to DHS program officials.   Finally, Exemption 5 was applied to documents that were in draft format that contained predecisional content that was not sufficiently developed to represent a final agency position.  Further detail is provided by the document level descriptions in the appended Vaughn index.

## FOIA Exemption 6

67. Exemption 6, 5 U.S.C. § 522(b)(6), permits the withholding of all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." When applying this exemption, the agency must balance the individual's personal privacy interest against the public need for purposes of shedding light on the agency's performance of its statutory duties.

68. DHS applied Exemption 6 to electronic communication records.  EPIC has informed DHS, through DHS's counsel, that EPIC does not challenge DHS's Exemption 6 withholdings. Therefore I do not further discuss those withholdings here.

## FOIA Exemption 7

69. DHS withheld law enforcement materials pursuant to FOIA Exemption 7. Exemption 7 permits withholding of "records or information compiled for law enforcement purposes" meeting certain specified criteria. 5 U.S.C. § 552(b)(7).

70. The DHS mission includes securing the homeland and law enforcement, and NPPD, the component within the Department with primary responsibility for the DIB Cyber Pilot, has a clear national security, homeland security and counterterrorism mission.  The records at issue in this litigation were compiled for law enforcement purposes within the meaning of Exemption 7,

because they concern the creation and implementation of a cybersecurity pilot program  This program was initiated to strengthen aspects of the national infrastructure that are vulnerable to attach by both foreign and domestic entities seeking to disrupt communications and information systems.  Specifically, the purpose of the DIB Cyber Pilot was to combat network exploitation and strengthen a critical piece of the nation's infrastructure.

71. DHS applied Exemption 7(d) to the names of certain companies that participated in the DIB Pilot.   The participating companies volunteered with an express promise of confidentiality and are thus confidential sources of law enforcement information.

72. DHS also applied Exemption 7(E), which affords protection to all law enforcement information that would "disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  DHS asserted the (b)7(e) redaction to protect records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions.

73. Cyber-security is one of the top priorities of DHS.   Securing the nation's private and public sector information technology systems is a vital aspect of homeland security as IT infrastructure is constantly under attack.   The DIB Cyber Pilot was initiated specifically to implement public-private information sharing in order to strengthen aspects of the national infrastructure that are vulnerable to attack by both foreign and domestic entities seeking to disrupt communications and information systems.

74. Specifically, Exemption 7(E) was applied to information that would reveal potential vulnerabilities in the programs DHS was developing in the cyber-security arena.   Revealing

such information would impair DHS's ability to collect information on possible cyber-attacks and develop such information into actionable investigative and/or prosecutorial leads. Knowledge of the information withheld under 7(e) by DHS, including operational methods, security procedures, technical vulnerability information, and countermeasure capabilities and techniques, would potentially assist those individuals and entities that engage in cyber-attacks and attempted cyber-attacks on both private and government sector information technology systems. In addition, disclosure of technical details pertaining to the DIB Cyber Pilot could facilitate unauthorized intrusions into DIB company or the government's networks or interference with future cybersecurity programs developed based on the DIB Cyber Pilot.

### Segregability

75. Under FOIA, "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). DHS has reviewed each record released responsive to plaintiffs' FOIA request to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied, and to determine which category of record(s) each document should be placed in the accompanying *Vaughn* index.

76. With respect to the records that were released in part, all information not exempted from disclosure pursuant to the FOIA exemptions specified above was segregated and non-exempt portions released. Information withheld was individually determined to be exempt from release. To the extent records were withheld in their entirety, because the exempt information was so inextricably intertwined with the non-exempt information, if any, no portion of those records could be reasonably segregated and disclosed. To the extent a small number of non-exempt words or phrases were dispersed throughout the withheld

information, those words and phrases, if disclosed, would be meaningless and would not serve the purpose of FOIA-to open agency action to the light of public scrutiny.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of June, 2013.

_____

James V.M.L. Holzer