**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 12-0333 (GK) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SECOND DECLARATION OF JAMES V.M.L. HOLZER**

I, James V.M.L. Holzer, I, declare and state as follows:

1. I am the Senior Director of FOIA Operations for the Department of Homeland Security (DHS) Privacy Office. In this capacity, I am the Department official immediately responsible for responding to requests for records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (the FOIA), the Privacy Act, 5 U.S.C. § 552a (the Privacy Act), and other applicable records access provisions. I have been employed by the DHS Privacy Office (DHS Privacy) in this capacity since November 2012. Prior to that, I held the position of Director of Disclosure and FOIA Operations. I have been with the Department since 2009. I make the following statements based upon my personal knowledge, which in turn is based on a personal review of the appropriate records in the case file and coordination with relevant FOIA personnel established for processing the subject request and upon information furnished to me in the course of my official duties.

2. Through the exercise of my official duties, I have become familiar with the background of plaintiff's FOIA request and DHS's response. I have also become familiar with

the background of this litigation and have read a copy of the complaint filed by plaintiff.  This is

the second declaration that I have provided in this matter.  My first declaration was executed

September 14, 2012 and submitted in support of defendant's motion to modify the scheduling

order.  (Document # 17-1.)  This declaration supports defendant's motion for summary

judgment.

## THE DEFENSE INDUSTRIAL BASE CYBER PILOT

3. The underlying FOIA request in this matter sought records related to the Defense

Industrial Base Cyber Pilot—called the "DIB Cyber Pilot" for short.  The DIB Cyber Pilot was a

joint effort by DHS and the Department of Defense to enable the provision of cybersecurity

capabilities enhanced by U.S. government information to protect critical defense industrial base

information systems and networks.

4. The Defense Industrial Base ("DIB") Sector is the worldwide industrial complex that

enables research and development, as well as design, production, delivery, and maintenance of

military weapons systems, subsystems, and components or parts, to meet U.S. military

requirements.  The DIB includes Department of Defense components and defense-industry

companies who perform under contract to the Department of Defense.

5. The DIB Sector is a critical component of our national infrastructure. The DIB Sector

provides products and services that are essential to mobilize, deploy, and sustain U.S. military

operations.  In recent years, as the United States' reliance on information technology has grown,

Department of Defense and DHS leaders have recognized that the DIB Sector—like other

important national infrastructure sectors—faces a dangerous, growing threat of cyber intrusion,

exploitation, and attack.  For example, as noted by Deputy Defense Secretary Lynn during his

cyber security remarks in Paris, a foreign intelligence agency in 2008 used a thumb drive to

penetrate United States classified computer systems.  Current cyber security threats include the

threat of theft of  data from both government and commercial networks, the threat of disruption

of communications networks that deny or degrade the use of important government or

commercial network, and the threat of destruction, where cyber tools may be used to cause

physical damage.

6. The purpose of the DIB Cyber Pilot was to evaluate the potential to enhance the

cybersecurity of participating DIB critical infrastructure entities and to protect sensitive

information and DIB intellectual property that directly supports national defense missions from

unauthorized access, exfiltration, and exploitation. During the DIB Cyber Pilot, DHS and the

Department of Defense shared classified threat and technical information with participating

internet service providers, in order to enhance the ability of DIB companies to safeguard

Department of Defense information that resides on, or transits, computer systems operated by

DIB companies through cybersecurity services offered to DIB companies by the internet service

providers.

7. The DIB Cyber Pilot involving internet service providers began as a DHS/DoD joint

proof of concept with operational capabilities beginning around May 2011 and DHS assuming

responsibility for the operational relationship with the internet service providers in

approximately January 2012.  (See http://www.dhs.gov/xlibrary/assets/privacy/

privacy_nppd_jcsp_pia.pdf).  The DIB Cyber Pilot was completed and announced as a

permanent program known as the DIB Enhanced Cybersecurity Services (DECS) on May 2012.

*See* www.defense.gov/news/d20120512dib.pdf.

## RECEIPT AND PROCESSING OF THE FOIA REQUEST

8. On July 26, 2011, EPIC submitted a FOIA request to DHS that sought records related
to the DIB Cyber Pilot; the request is included as exhibit 1 to this declaration.  *See* Tab A-1.
EPIC's request described the pilot as "the new NSA pilot."  However, DHS later clarified with
EPIC that EPIC was referring to, and seeking records regarding, the DIB Cyber Pilot.[1]  The
FOIA request, as initially submitted,[2] sought the following documents: (1)  "All contracts and
communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or other defense
contractors regarding the new NSA pilot program;"  (2)  "All contracts and communications with
AT&T, Verizon, and CenturyLink or any other [Internet Service Providers] regarding the new
NSA pilot program;" (3)  "All analyses, legal memoranda, and related records regarding the new
NSA pilot program;" (4)  "Any memoranda of understanding between NSA and DHS or any
other government agencies or corporations regarding the new NSA pilot program;" (5) "Any
privacy impact assessment performed as part of the development of the new NSA pilot
program."  EPIC's request is attached to this declaration as Exhibit A.

9. On August 3, 2011, DHS Privacy acknowledged EPIC's FOIA Request, which it
assigned file number DHS/OS/PRIV 11-1104; the response is included as exhibit 2 to this
declaration.  *See* Tab A-2.  DHS Privacy indicated that the agency had conducted a search and

---

[1] EPIC's request stated, incorrectly, that "no public name" had been given to the pilot program.
The request also cited a June 16, 2011 Washington Post article that quoted remarks made by
Deputy Defense Secretary William J. Lynn III at a global security conference in Paris. Deputy
Secretary Lynn's comments described the "DIB Cyber Pilot" as follows:  "In this Defense
Industrial Base -- or DIB -- Cyber Pilot, the Defense Department is sharing classified threat
intelligence with defense contractors or their commercial internet service providers along with
the know-how to employ it in network defense. By furnishing network administrators with this
threat intelligence, we will be able to strengthen the existing cyber defenses at defense
companies."

[2] After DHS conducted a search for documents and informed EPIC of the volume of potentially
responsive documents, EPIC narrowed the scope of its request as outlined in paragraph 13
below.

been unable to identify or locate any records responsive to category 5 of EPIC's FOIA Request.

DHS Privacy notified EPIC of the right to appeal this determination and that it had referred

EPIC's FOIA Request to the DHS National Protection and Programs Directorate ("NPPD" or

"the Directorate") for further processing and direct response.  EPIC declined to appeal DHS's

determination with respect to category E.

     10. DHS's August 3, 2011 response also notified EPIC that the DHS Privacy Office had

referred categories 1 through 4 of the request to the FOIA Office of DHS's National Protection

& Programs Directorate ("NPPD") for further processing and response since the documents

requested were most likely to be located within NPPD offices.

     11. On January 5, 2012, EPIC transmitted via facsimile a purported administrative appeal

to NPPD's FOIA Office, appealing NPPD's non-responsiveness to categories 1-4 of EPIC's

FOIA Request (categories (a)-( d) above).  Tab A-3.  Prior to receiving EPIC's facsimile, NPPD

FOIA's Office had started to process the request by tasking out the search to the office that was

most directly responsible for DHS's involvement in the DIB Cyber Pilot, NPPD's subcomponent

the Office of Cybersecurity and Communications (CS&C).  NPPD FOIA Officials had also

engaged with CS&C officials regarding the appropriate way to proceed with the FOIA Request

given its potentially broad scope.  During January of 2012, a FOIA Specialist with NPPD spoke

with EPIC by telephone and discussed the status of the FOIA request, indicating that the

remaining four categories of the request were being processed.

     12. Plaintiff filed this litigation on March 1, 2012, without waiting for DHS to complete

the administrative processing of the request.  DHS answered on May 1, 2012.

     13. In the meantime, DHS continued with its processing of EPIC's FOIA request by

conducting the searches outlined below in paragraphs .  In August 2012, after DHS informed

EPIC that DHS had collected more than 10,000 pages of potentially responsive records, EPIC

narrowed the scope of its FOIA request by excluding "draft documents" from the scope of its

request and by narrowing Category 3 of the request.  Tab A-4.  EPIC's revised request sought,

excluding draft documents:

> (a) all contracts and communications with Lockheed Martin, CSC, SAIC,
> Northrop Grumman or other defense contractors regarding the DIB Cyber Pilot;
>
> (b) all contracts and communications with AT&T, Verizon, and CenturyLink or
> any other Internet Service Providers regarding the DIB Cyber Pilot;
>
> (c) all legal and technical analyses, including legal memoranda, regarding the DIB
> Cyber Pilot; and
>
> (d) any memoranda of understanding between NSA and DHS or any other
> government agencies or corporations regarding the DIB Cyber Pilot.

*See id.*; *see also* Tab A-1.

## NPPD'S SEARCH

14. NPPD leads the national effort to protect and enhance the resilience of the nation's

physical and cyber infrastructure.. NPPD includes four subcomponents:  the Office of

Infrastructure Protection, the Federal Protective Service, the Office of Biometric Identity

Management, formerly known as the Office of U.S. Visitor and Immigrant Status Indicator

Technology, and the Office of Cybersecurity and Communications (CS&C). CS&C is

particularly relevant here because it has the mission of assuring the security, resiliency, and

reliability of the nation's cyber and communications infrastructure; it is the office that was most

directly responsible for DHS's participation in the DIB Cyber Pilot.

15. When the NPPD FOIA Office receives a FOIA request, either directly or through a

referral, NPPD FOIA personnel make a determination regarding which NPPD subcomponent or

program office may have responsive documents, and then the FOIA personnel task those offices

with searching for responsive records.  In this case, the NPPD FOIA Office met with subject

matter experts who had been involved in the DIB Cyber Pilot and with DHS Office of General

Counsel (OGC) attorneys. Together they identified the following NPPD subcomponents as most

likely have responsive records, and tasked these offices with conducting electronic and physical

record searches for potentially responsive documents:   a) the NPPD Office of the Under

Secretary, including the Deputy Under Secretary and the Deputy Under Secretary for

Cybersecurity ; b) the NPPD Office of Privacy (NPPD Privacy); c) the NPPD Office of

Cybersecurity & Communications (CS&C), which as noted above, is responsible for enhancing

the security, resiliency, and reliability of the nation's cyber and communications infrastructure.

NPDD did not search the offices of its other subcomponents, including the Office of Biometric

Identity Management, the Federal Protective Service, or the Office of Infrastructure Protection,

because those subcomponents did not have responsibilities for the DIB Cyber Pilot and thus

would be unlikely to have responsive records.

16. In addition to tasking the above-described NPPD subcomponents with searches,

NPPD provided the original FOIA request to the DHS Office of General Counsel and an office

within the DHS Directorate for Management, the Office of Selective Acquisitions (OSA) (which

is within the DHS Office of the Chief Procurement Officer in the Directorate for Management),

for review and possible response.  The DHS Office of General Counsel (OGC) provides legal

support to the Department, and had specifically supported the DIB Cyber Pilot project staff.

The Directorate for Management is responsible for the DHS budget, appropriations, expenditure

of funds, accounting and finance, and procurement, among other functions; its subcomponent

OSA is responsible for overseeing the execution of classified procurements, and NPPD thought

that OSA might have procurement-type records related to the DIB Cyber Pilot, such as contracts

and communications.

17. NPPD did not search other offices within the Directorate for Management, such as the Office of the Chief Financial Officer or the Office of the Chief Information Officer, because those offices did not have direct responsibilities for the DIB Cyber Pilot, and would not tend to have had records containing legal or technical analysis, or contracts or communications with the DIB companies or CSPs.  Similarly, NPPD did not search the DHS Office of the Secretary (although that office had initially been searched as described in DHS's August 2011 response letter to EPIC, *see* Tab A-2), the DHS Office of the Deputy Secretary, or other DHS components such as the Science and Technology Directorate or the Office of Policy, because those offices would not be likely to have records of legal or technical analysis that were non-duplicative from the records maintained by NPPD or OGC, or records of communications and contracts that were non-duplicative of NPPD or OSA.  In addition, NPPD did not search other Department components like the Transportation Security Administration (TSA), the Federal Law Enforcement Training Center, or the United States Coast Guard, etc., because those components did not likely have any connection to the DIB Cyber Pilot.

18. Working with the subject matter experts, NPPD FOIA also crafted keywords to be used in electronically searching for responsive documents.  The following keywords were provided to the NPPD components to use in the initial searches conducted in April 2012: Monitor + Defense contractors; Defense contractors + internet; DIB pilot; NSA Pilot; MOA + DHS + NSA; PIA + DIB; PIA + NSA; ISPs Monitor; Monitor Internet + NSA.  The following keywords were added in early May 2012: NSA pilot; NSA + [name of various DIB companies]; NSA + [name of various internet service providers]; NSA + Monitor + Internet; NSA + DHS + pilot; JCSP; DIB pilot; and DoD + pilot.

19. Each individual office and employee was instructed to conduct searches of his or her documents utilizing their knowledge of how and where they stored their own documents and records.  For example, employees that organized their documents topically into folders and subfolders had no need to run keyword searches and would retrieve their documents by going to the specified folder location.

### NPPD Office of the Under Secretary (OUS)

20. The NPPD OUS provides directorate leadership and coordinates activities throughout the Directorate.  The OUS is responsible for the management of all four subcomponent offices of NPPD.

21.   The NPPD FOIA Office determined that the OUS search would be best coordinated with the OUS Executive Secretariat (ExecSec).  OUS ExecSec is responsible for coordinating appropriate and expeditious action on tasks addressed to the Directorate.  It serves as the hub for coordinating, tracking, prioritizing, and responding to all tasks assigned to NPPD.

22. At the time of the records search, OUS ExecSec routinely used a Microsoft Access database of individual records ExecSec taskings.  Each database record contained a unique tracking number, description of the tasking, notations regarding the life cycle of a tasking, including information on who was tasked and links to the associated files which are saved on an ExecSec shared drive.  The database was searched using the key terms and supplemented by the ExecSec staff's general knowledge of the database and how documents and records were usually kept.  In addition to searching the database, the ExecSec staff searched the ExecSec shared inbox and classified information accounts of ExecSec staff members with classified information access.

23. NPPD FOIA worked with OUS ExecSec and program officials to identify key OUS staff and officials who were likely to have all the potentially responsive documents within OUS

including any incidental communication with other NPPD staff and officials.  Several key employees were identified as possibly in possession of potentially responsive documents. NPPD FOIA sent the identified OUS employees a tasking requesting that each employee conduct a search for potentially responsive records.  The search terms developed by NPPD FOIA that are listed in paragraph 17 were also provided to the appropriate employees.

24.  Potentially responsive documents were located and turned over to DHS Privacy for further processing.

### NPPD Privacy

25. The NPPD Privacy Office resides within the NPPD OUS.  The Privacy Office was identified as potentially possessing responsive documents, particularly regarding the Privacy Impact Assessment (PIA) and Privacy Threshold Assessment (PTA).

26. At the time of the search in April 2012, all NPPD Privacy employees searched their personal files, both electronic and hard copy, if applicable, and unclassified network files (*i.e.*, emails, internal drives, and shared drives) for responsive records.  A search was conducted on the classified network as well.

27. The searches were conducted using the search words provided by NPPD FOIA, as well as their personal knowledge of where and how they kept their documents and records on the DIB pilot.  The potentially responsive documents were compiled, duplicates removed, and forwarded to the NPPD FOIA office and then DHS Privacy for further action.

### NPPD Office Of Cybersecurity And Communications (CS&C)

28. CS&C is responsible for building and maintaining a national cybersecurity incident response system, implementing a cyber risk management program for protection of critical infrastructure, and planning for and providing national security and emergency preparedness

communications to the Federal government.  At the time of the search CS&C was comprised of

four offices.  The National Cyber Security Division (NCSD) works collaboratively with public,

private and international entities in risk assessment and threat/vulnerability reduction.  The

National Cybersecurity and Communications Integration Center (NCCIC) serves as a centralized

location where operational elements involved in cybersecurity and communications reliance are

coordinated and integrated.  The National Communications System (NCS) assisted the President,

the National Security Staff, and others in telecommunications functions and coordinating of

national security and emergency preparedness communications.  The Office of Emergency

Communications (OEC) provides support to emergency responders and government officials to

facilitate their communication.

29. On or about April 12, 2012, the CS&C FOIA Liaison tasked NCSD (which included

US-CERT) and NCCIC to search for documents potentially responsive to this request.  These

offices were retasked with the additional search terms on May 08, 2012. NCS and OEC were not

tasked as it was determined by CS&C that their communication related missions would not have

been involved with the DIB Pilot program.

30. The individuals within the offices that conducted the searches determined where

potentially relevant documents would be contained within systems based upon their particular

knowledge of where and how they kept their documents and records on this subject.   The CS&C

FOIA Liaison worked with the NPPD FOIA office to compile the documents that were received

from NCSD, US-CERT, and NCCIC.

31. Responsive documents were located in personal files and, using the keywords

outlined above in paragraph 16, computer systems searches were conducted on Unclassified

(email, local drives, and shared networks) and Classified Local Area Networks (also including

email and shared drives). The classified networks include the Joint Worldwide Intelligence

Communication System (JWICS) and the Homeland Security Data Network (HSDN).

32. Potentially responsive documents were located and turned over to the DHS Privacy

for further processing.

## Search of the DHS Office of General Counsel

33. The DHS Office of the General Counsel (OGC) is responsible for providing legal

advice and making legal policy determinations within the Department and its components.

OGC is organized into ten divisions that align with the DHS component offices.   The National

Protection and Programs Legal Division (NPPLD) serves as counsel to the National Protection

and Programs Directorate, which is the parent component office of CS&C.  NPPLD  with

searching for documents potentially responsive to this request.

34. The NPPLD determined that two attorneys, the NPPLD Deputy Associate General

Counsel, and an attorney-advisor within the division would potentially have responsive

documents.   This determination was made based on specific attorneys that were assigned to

advise NPPD on the DIB program as subject matter experts.

35.   Both identified attorneys searched their records for potentially responsive records by

manually identifying the specific location within their email archives, physical hardcopy files,

and computer hard drives where they had stored all documents relating to the DIB program.

Both unclassified and classified email networks were searched by both attorneys.

36. The individuals that conducted the searches determined that all potentially relevant

documents would be contained within the individuals' physical hard copy files and agency email

systems based upon their particular knowledge of where and how they kept their documents and

records on this subject.

37. Information resided in emails and attachments to emails that each individual attorney archived in his or her own archive structure. Both attorneys advised respectively that they stored their documents relating to the DIB program in a specific email archive folders and/or in their own physical hardcopy files.

38. Potentially responsive documents were located and turned over to the DHS Privacy for further processing.

**Search of the Office of the Chief Procurement Officer**

39. The Office of the Chief Procurement Officer (OCPO), resides as a subcomponent office of the DHS Undersecretary for Management. The OCPO is responsible for effectively delivering mission capability through the contracting of critical supplies and services. The OCPO serves as the principal contracting entity on behalf of NPPD and other components that do not have separate procurement offices.

40. Although participation in the DIB program by private entities was voluntary and it was not anticipated that contract documents would be located, out of an abundance of caution, NPPD determined that OCPO should be tasked with the search for this FOIA request.

41. Within the OCPO, classified and other sensitive contracts are handled by the Office of Selective Acquisitions (OSA). The OSA was identified by NPPD to be the entity within OCPO that was most likely to have potentially responsive documents based on the classified and sensitive nature of the DIB program.

42. The OSA conducted a search based on several key terms. A number of potentially responsive documents were located and provided to DHS Privacy for processing; however, the documents located by the OSA search were determined by DHS Privacy to be non-responsive to the FOIA request.

**Processing of Potentially Responsive Documents Returned by the Searches**

43.  By the end of July 2012, NPPD had gathered more than 16,000 pages of potentially responsive documents.  DHS assigned a team of FOIA specialists and attorneys to review the documents that had been gathered to remove duplicates and weed out documents that had turned up because of DHS's electronic keyword search but plainly were not responsive to EPIC's request. DHS FOIA professionals and attorneys who had been assigned to the project spent several weeks reviewing the more than 16,000 pages of documents and culled them down to approximately 10,000 pages.  These 10,000 pages were considered potentially responsive; they required more careful reading and review to identify which records/pages were actually responsive to the request.

44. Faced with this very large volume of potentially responsive documents, and recognizing that NPPD FOIA lacked the resources to process this volume of documents in a reasonable amount of time, DHS reassigned DHS Privacy to assist with this FOIA.

The DHS Privacy Office conducted page-by-page and line-by-line reviews of the potentially responsive documents to identify those records that were actually responsive to EPIC's revised request, described in paragraph 13, above.  DHS made every effort to segregate the exempt portions of the responsive records from the non-exempt portions of them. Extraordinary care was required when processing these documents to ensure that the constraints on the disclosure of classified and law-enforcement sensitive information were properly observed, and that no inadvertent disclosures of classified information were made.

45. On December 17, 2013, DHS Privacy issued its first interim response to EPIC, indicating that DHS had identified 494 pages of responsive materials that were being withheld in their entirety pursuant to Title 5 U.S.C. § 552 (b)(1), (b)(5), and (b)(7)(E) FOIA Exemption 1, 5,

and 7(E).  DHS later determined that the number of pages identified in this response was

inaccurate because it included some number of pages of non-responsive documents in addition to

the pages of withheld-in-full documents.

46. On April 15, 2013, DHS Privacy completed and produced to plaintiff its second final

response, which consisted of 1,276 pages.  *See* Tab A-5.  Of those pages, DHS Privacy

determined that 117 pages of the records were releasable in their entirety, 1,159 pages were

partially releasable pursuant to Title 5 U.S.C. § 552 (b)(6), and (b)(7)(E), FOIA Exemptions 6

and 7(E).  DHS Privacy transmitted this response directly to the Department of Justice (DOJ) for

handling in light of the current litigation.

47. Following its production of responsive documents, DHS made itself available to

answer EPIC's questions regarding the production.  On June 20, 2013, EPIC sent DHS, through

DHS's counsel, a list of documents that EPIC believed were missing from the production.  Tab

A-6. My office reviewed the list of documents identified by EPIC and conducted a supplemental

search, as described in the next paragraph.

48. DHS Privacy and NPPD culled through the collection of previously located

"potentially responsive documents" that had been collected by the agency's searches and

provided to DHS Privacy.  DHS Privacy and NPPD located all documents listed by Plaintiffs.

Of the seventeen (17) documents identified by Plaintiffs as "missing", DHS confirmed that

thirteen (13) of the documents were non-responsive to the FOIA request (based on the August

2012 revision to the scope of the request, Tab A-4) because they were either (a) draft documents

or (b) otherwise non-responsive because they did not contain legal or technical analysis,

communications or contracts with the DIB companies or CSPs, or deal with the subject matter of

the DIB Cyber Pilot.  One (1) of the documents was one that DHS had previously determined to

be a draft document that was not responsive to EPIC's request.  DHS Privacy reexamined the

document during its supplemental search and determined that it should be considered to be a

final document, responsive to the request; this document was supplementally released to plaintiff

on August 16, 2013.  Also during its supplemental search, DHS went back to the recipients or

authors of the emails that had mentioned or attached the seventeen documents, to try to locate

final versions of draft documents if final versions of the documents existed.   Through this

process, DHS located one (1) document for which it had had previously only located a draft

version.  That document was supplementally released to plaintiff on August 16, 2013.  Three (3)

of the seventeen (17) documents had been inadvertently excluded from the April 15, 2013

production; they were also supplementally released to Plaintiffs on August 16, 2013.

49.  On August 16, 2013, DHS issued a supplemental response to EPIC's request.  *See*

Tab A-7.  A total of 84 pages of records were provided to Plaintiffs.   Of the 84 pages, 25 pages

were rereleased documents from the April 15, 2013 production because DHS had determined to

make certain additional discretionary releases of information.  Fifty-nine pages of the response

had not previously been provided to Plaintiffs, corresponding with the documents located and/or

re-reviewed in the supplemental search and described in paragraph 49.

50. In total, DHS released 1,386 pages of documents, including some released in full and

some released in part, and withheld in full 362 pages of documents.

## APPLICABLE FOIA EXEMPTIONS

51. Within the 456 documents that DHS released in whole or in part and the 26 documents

that DHS withheld in full, DHS withheld information exempt from the FOIA pursuant to FOIA

Exemptions (b)(1), (b)(3), (b)(4), (b)(5), (b)(6), and (b)(7).  The rationale of the DHS FOIA

Office for withholding each particular category of information (except for information withheld

under Exemption 6, which plaintiff does not challenge) is set forth below, and in the

accompanying *Vaughn* Index (attached as an Appendix to this declaration).

## FOIA Exemption 1

52. DHS determined—after reviewing the DIB Cyber Pilot records and consulting with

other federal agencies, particularly with the National Security Agency ("NSA")—that certain

portions of the records were exempt under 5 U.S.C. § 552(b)(1) and must be withheld.

Exemption 1 protects information that is "(A) specifically authorized under criteria established

by an Executive order to be kept secret in the interest of national defense or foreign policy and

(B) [is] in fact properly classified pursuant to such Executive order".  5 U.S.C. § 522(b)(1).

Much of the information withheld pursuant to Exemption 1 consists of information withheld by

DHS on behalf of the National Security Agency (NSA); that information was primarily withheld

because it would reveal information about that agency's organization, functions, and activities,

which is protected from release primarily by FOIA Exemption 3 in conjunction with Section 6 of

the NSA Act of 1959, and 18 U.S.C. § 798, and is also protected from release by Exemption 1

because it is classified.  The information that was withheld as classified under Exemption 1 is

information that, if disclosed, would reveal classified details of NSA activities or would

otherwise reveal classified information as specified below and in the *Vaughn* index.

53. Records related to the DIB Cyber Pilot were created—and where necessary,

classified—between 2009 and 2012.  The classified documents therefore were classified under

either E.O. 13,292 or E.O. 13,526, depending on when each document was created.  Because the

pertinent sections of each Executive Order are not substantially different for the purposes of

DHS's Exemption 1 analysis, I will address only the current E.O. 13,526, which was the Order

that was in effect during the processing of the records when DHS, along with NSA and other federal agencies, conducted the segregability analysis.

54. The classified portion of the record collection in this case was withheld based on NSA's original classification authority.  E.O. 13,526 Part 1. Certain information that was reproduced, extracted, or summarized by DHS from materials classified by NSA or another federal agency was withheld based on DHS's derivative classification authority.  E.O. 13,526 Part 2.

55. DHS worked with other federal agencies including DOD and NSA to review the records that had been located on DHS's classified systems, to segregate information that could be released as unclassified, and to withhold information that remains properly classified.  David J. Sherman, Associate Director for Policy and Records at the National Security Agency, who serves as a TOP SECRET classification authority reviewed the NSA-related records in this case. Mr. Sherman determined that certain information within them meets the criteria for classification and is in fact currently and properly classified at the SECRET level in accordance with E.O. 13526. Working with NSA, my office segregated the unclassified or declassified information and released it, while withholding that information that is currently and properly classified.

56. According to E.O. 13,526, information may be considered for classification if "its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security" and if it pertains to one or more of eight specified categories of information.  _Id._ § 1.4.  In this case, certain information within the records is classified under one or both of two of the eight specified categories, namely the categories described in sub-sections 1.4(e) and 1.4(g).  The information in question reveals capabilities and/or vulnerabilities of systems relating to the national security, specifically electronic networks used by the defense

industrial base sector. Some of the information in question is also classified as pertaining to technological matters relating to the national security, namely cybersecurity operations of the federal government and defense contractors.

57. The unauthorized disclosure of the withheld classified information reasonably could be expected to cause identifiable or describable damage to national security.  Some of the information is classified as TOP SECRET because the unauthorized release of this information reasonably could be expected to cause exceptionally grave damage to the national security, and some of the information is classified as SECRET the unauthorized release of this information reasonably could be expected to cause serious damage to the national security.

58. The withheld classified information relates to vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services, as well as scientific and technological information regarding cyber security measures.  Release of the information would indicate to our adversaries the strengths and/or weaknesses of our systems.  Our adversaries could then either seek to exploit any identified weaknesses, or engage in countermeasures in order to reduce the effectiveness of said systems.  DHS also withheld certain information that would reveal how NSA conducts its mission; the disclosure of this operational information could reasonably be expected to cause serious damage to the national security by potentially jeopardizing certain activities that NSA undertakes in furtherance of its mission.

### FOIA Exemption 3

59. On behalf of NSA, DHS also withheld information pursuant to Exemption 3.  Section 552(b)(3) of the FOIA provides that the FOIA does not require the release of matters that are specifically exempt from disclosure by statute, provided that such statutes: (A) require that the matters be withheld from the public in such a manner as to leave no discretion on this issue; or,

(B) establish particular criteria for withholding or refer to particular types of matter to be withheld.  Review of the application of Exemption 3 statutes consists solely of determining that the statute relied upon qualifies as an Exemption 3 statute and that the information withheld falls within the scope of the statutes.

60. The redactions of information under Exemption 3 here consist primarily of employee names, personally identifiable information, and telephone numbers, as well as information relating to the NSA's internal processes, and activities, such as handling instructions for classified information, activities, relationships, and our foreign partners.  Also redacted is information that relates directly to NSA activities in relation to its Information Assurance mission, and would reveal classified Agency activities in support of its mission.  That information falls squarely within the scope of a statutory privilege unique to NSA.  As set forth in Section 6 of the National Security Agency Act of 1959, Public Law 86-36 (50 U.S.C. § 402 note), "[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof, or of the names, titles, salaries, or number of persons employed by [NSA]."  Further, NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege, but only to show that the information relates to its activities.  To invoke this privilege, NSA must demonstrate only that the information it seeks to protect falls within the scope of section 6.  NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

61. DHS, after appropriate coordination with NSA, also made statutory redactions pursuant to 18 U.S.C. § 798.  This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States; or (ii)

obtained by the process of communication intelligence derived from the communications of any

foreign government.  The term "communications intelligence," as defined by 18 U.S.C. § 798(b),

means all procedures and methods used in the interception of communications and the obtaining

of information from such communications by other than the intended recipients.  Congress

enacted this statute to protect the fragile nature of NSA's SIGINT efforts, to include, but not

limited to, the existence and depth of signals intelligence-related successes, weaknesses, and

exploitation techniques.  This statute recognizes the vulnerability of signals intelligence to

countermeasures and the significance of the loss of valuable intelligence information to national

policymakers and the Intelligence Community.  Given that Congress specifically prohibited the

disclosure of classified information related to its communications intelligence activities, DHS,

after coordination with NSA, determined that NSA's SIGINT activities and functions, and its

intelligence sources and methods would be revealed if certain of the withheld information was

disclosed.

62. Because disclosure of the NSA information described above is prohibited by statute, I

determined that it has been properly withheld as exempt from disclosure pursuant to Exemption

3 of the FOIA.

## FOIA Exemption 4

63. Exemption 4, 5 U.S.C. § 522(b)(4), protects "trade secrets and commercial or

financial information obtained from a person [that is] privileged or confidential."  DHS asserted

the (b)(4) exemption for certain commercial information contained in contract documents that is

protected by trade secret and commercial or financial information obtained from a person that is

privileged or confidential.

64. Participation by DIB companies and CSPs in the DIC Cyber Pilot was voluntary, and the information provided by these companies to the government was also done on a voluntary basis.  The declaration provided by Mark H. Herrington, Associate Deputy General Counsel in the Office of General Counsel, Department of Defense, describes the basis for the Exemption 4 withholding of certain DIB company information, including their identities.  Generally speaking DHS did not withhold the identities of the CSPs on an Exemption 4, but DHS did withhold the names if the context of the released information would reveal proprietary information about the CSPs that is of a kind that the CSPs would not customarily release themselves.  In that situation, DHS withheld identifying information in order to divorce the company's identity from the information that was released so that the substance of the information could be released and the companies' anonymity could be respected.

## FOIA Exemption 5

65. Exemption 5, 5 U.S.C. § 522(b)(5), allows for the withholding of intra-agency documents that are normally privileged in the civil discovery context. The deliberative process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within interagency or intra-agency memoranda or letters. The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.

66.  Specifically, as detailed in the accompanying Vaughn index, DHS applied this exemption to protect the contents of inter and intra-agency email communications that revealed the predecisional discussions of senior agency and DHS program office personnel.   Exemption 5

was also applied to protect attorney-client privileged communications and legal advice provided

by DHS counsel to DHS program officials.   Finally, Exemption 5 was applied to documents that

were in draft format that contained predecisional content that was not sufficiently developed to

represent a final agency position.  Further detail is provided by the document level descriptions

in the appended Vaughn index.

### FOIA Exemption 6

67. Exemption 6, 5 U.S.C. § 522(b)(6), permits the withholding of all information about

individuals in "personnel and medical files and similar files" when the disclosure of such

information "would constitute a clearly unwarranted invasion of personal privacy." When

applying this exemption, the agency must balance the individual's personal privacy interest

against the public need for purposes of shedding light on the agency's performance of its

statutory duties.

68. DHS applied Exemption 6 to electronic communication records.  EPIC has informed

DHS, through DHS's counsel, that EPIC does not challenge DHS's Exemption 6 withholdings.

Therefore I do not further discuss those withholdings here.

### FOIA Exemption 7

69. DHS withheld law enforcement materials pursuant to FOIA Exemption 7. Exemption

7 permits withholding of "records or information compiled for law enforcement purposes"

meeting certain specified criteria. 5 U.S.C. § 552(b)(7).

70. The DHS mission includes securing the homeland and law enforcement, and NPPD,

the component within the Department with primary responsibility for the DIB Cyber Pilot, has a

clear national security, homeland security and counterterrorism mission.  The records at issue in

this litigation were compiled for law enforcement purposes within the meaning of Exemption 7,

because they concern the creation and implementation of a cybersecurity pilot program  This program was initiated to strengthen aspects of the national infrastructure that are vulnerable to attach by both foreign and domestic entities seeking to disrupt communications and information systems.  Specifically, the purpose of the DIB Cyber Pilot was to combat network exploitation and strengthen a critical piece of the nation's infrastructure.

71. DHS applied Exemption 7(d) to the names of certain companies that participated in the DIB Pilot.   The participating companies volunteered with an express promise of confidentiality and are thus confidential sources of law enforcement information.

72. DHS also applied Exemption 7(E), which affords protection to all law enforcement information that would "disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  DHS asserted the (b)7(e) redaction to protect records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions.

73. Cyber-security is one of the top priorities of DHS.   Securing the nation's private and public sector information technology systems is a vital aspect of homeland security as IT infrastructure is constantly under attack.   The DIB Cyber Pilot was initiated specifically to implement public-private information sharing in order to strengthen aspects of the national infrastructure that are vulnerable to attack by both foreign and domestic entities seeking to disrupt communications and information systems.

74. Specifically, Exemption 7(E) was applied to information that would reveal potential vulnerabilities in the programs DHS was developing in the cyber-security arena.   Revealing

such information would impair DHS's ability to collect information on possible cyber-attacks and develop such information into actionable investigative and/or prosecutorial leads. Knowledge of the information withheld under 7(e) by DHS, including operational methods, security procedures, technical vulnerability information, and countermeasure capabilities and techniques, would potentially assist those individuals and entities that engage in cyber-attacks and attempted cyber-attacks on both private and government sector information technology systems. In addition, disclosure of technical details pertaining to the DIB Cyber Pilot could facilitate unauthorized intrusions into DIB company or the government's networks or interference with future cybersecurity programs developed based on the DIB Cyber Pilot.

### Segregability

75. Under FOIA, "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." *5* U.S.C. § 552(b). DHS has reviewed each record released responsive to plaintiffs' FOIA request to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied, and to determine which category of record(s) each document should be placed in the accompanying *Vaughn* index.

76. With respect to the records that were released in part, all information not exempted from disclosure pursuant to the FOIA exemptions specified above was segregated and non-exempt portions released. Information withheld was individually determined to be exempt from release. To the extent records were withheld in their entirety, because the exempt information was so inextricably intertwined with the non-exempt information, if any, no portion of those records could be reasonably segregated and disclosed. To the extent a small number of non-exempt words or phrases were dispersed throughout the withheld

information, those words and phrases, if disclosed, would be meaningless and would not serve the purpose of FOIA-to open agency action to the light of public scrutiny.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of June, 2013.

_____

James V.M.L. Holzer

# Tab A-1

FOIA Request, dated July 26, 2011

# ELECTRONIC PRIVACY INFORMATION CENTER

1718 CONNECTICUT AVENUE NW, SUITE 200
WASHINGTON, D.C. 20009
202-483-1140
FAX 202-483-1248

CONFIDENTIAL – SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION BY OTHER THAN
ITS ADDRESSEE IS STRICTLY PROHIBITED. IF THIS FACSIMILE HAS BEEN RECEIVED IN ERROR,
PLEASE IMMEDIATELY NOTIFY THE SENDER

## TO: MARY ELLEN CALLAHAN   FROM: ANDREW CHRISTY

COMPANY:

Department of Homeland Security

DATE:

7/26/2011

RECIPIENT'S FAX NUMBER:

703-235-0443

SENDER'S EMAIL:

Christy@epic.org

RECIPIENT'S TELEPHONE NUMBER:

SENDER'S TELEPHONE NUMBER:

(202) 483-1140

TOTAL NO. OF PAGES INCLUDING COVER:

4

## COMMENTS:



JUL 2 7 2011
11-1104



July 26, 2011

VIA FACSIMILE: (703) 235-0443

Chief FOIA Officer Mary Ellen Callahan
The Privacy Office
U.S. Department of Homeland Security
245 Murray Drive SW, Building 410
STOP-0655
Washington, D.C. 20528

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

RE: Freedom of Information Act Request

Dear Ms. Callahan:

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted on behalf of the Electronic Privacy Information Center ("EPIC"). EPIC seeks documents regarding a joint National Security Agency ("NSA") and Department of Homeland Security ("DHS") pilot program, which has not been publicly named, designed to monitor all internet traffic routed to several defense contractors and attempts to detect whether there are malicious programs within this internet traffic designed to compromise the defense contractor security.

## Background

The Washington Post reported on June 16, 2011 that the NSA implemented a new program in May designed to monitor all traffic flowing through certain ISPs to a select number of defense contractors.[1] The current purported goal of this pilot program is the "thwarting [of] cyberattacks against defense firms," although Deputy Secretary of Defense William J. Lynn III stated that "[w]e hope the . . . cyber pilot can be the beginning something bigger."[2] According to Lynn, the NSA pilot program is to serve as a model that can be "transported to other critical infrastructure sectors, under the leadership of the Department of Homeland Security."[3]

In the week after this program became public knowledge, the Washington Post and the Atlantic[4] provided any press coverage. Although no public name has been given to this new program, it is known that the NSA has partnered with ISPs AT&T, Verizon

---

[1] *NSA Allies with Internet Carrieser to Thwart Cyber Attacks Against Defense Firms*, Ellen Nakashima, WASH. POST, June 16, 2011 http://www.washingtonpost.com/national/major-internet-service-providers-cooperating-with-nsa-on-monitoring-traffic/2011/06/07/AG2dukXH_story.html.

[2] *Id.*

[3] *Id.*

[4] *See Prepare to Have Your Email Read by the NSA*, Adam Estes, THE ATLANTIC, June 17, 2011 http://www.theatlanticwire.com/technology/2011/06/prepare-have-your-email-read-nsa/38931/. Despite the provocative headline, none of the details offered in the article suggest that the NSA is actually reading e-mails (at least as part of this new program).

and CenturyLink to filter the traffic of fifteen defense contractors, including Lockheed Martin, CSC, SAIC and Northrop Grumman. The NSA claims that it will not be "direct[ly] monitoring the contractors' networks"; instead, it has developed "signatures" of malicious code as well as sequences of suspicious network behavior that it will apply to filter all internet traffic on those ISPs that is "flowing" to these defense contractors.[5] By applying these signatures and filtering suspicious behavior, the NSA will be able to "disable the threats before an attack can penetrate a contractor's servers."[6]

Individuals within the Department of Justice ("DOJ"), likely in the Office of Legal Counsel ("OLC"), which provides opinions on the legality of executive branch programs, reportedly expressed misgivings that the program would "run afoul of privacy laws forbidding government surveillance of private Internet traffic."[7] Presumably this refers to the Electronic Communications Privacy Act ("ECPA"), codified at 18 U.S.C. § 2510, which prohibits the interception of electronic communications without a court order or consent from one of the parties. However, the NSA has reportedly "allayed that concern by saying that the government will not directly filter the traffic or receive the malicious code captured by Internet providers."[8] It is unclear how the program can detect "malicious code" and prevent its execution without "captur[ing]" it in violation of federal law, but Lynn may be offering some explanation by stating that the "threat intelligence provided by the government is helping the companies themselves, or the Internet service providers working on their behalf, to identify and stop malicious activity within their networks."[9]

Deputy Secretary of Defense William J. Lynn III publicly spoke about the program and provided a rough outline of its scope.[10] He stated that it is currently run by the NSA, and that DHS is a partner.

<u>Requested Documents</u>

1. All contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or any other defense contractors regarding the new NSA pilot program.

2. All contracts and communications with AT&T, Verizon and CenturyLink or any other IPSs regarding the new NSA pilot program.

3. All analyses, legal memoranda, and related records regarding the new NSA pilot program.

4. Any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the new NSA pilot program.

---

[5] *See* Nakashima, *supra* note 1.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *See* Nakashima, *supra* note 1.

5. Any privacy impact assessment performed as part of the development of the new NSA pilot program.

## Request for "News Media" Fee Status

EPIC is a "representative of the news media" for fee waiver purposes. *EPIC v. Department of Defense*, 241 F. Supp. 2d 6 (D.D.C. 2003). Based on our status as a "news media" requester, we are entitled to receive the requested record with only duplication fees asserted. Further, because disclosure of this information will "contribute greatly public understanding of the operation or activities of the government," and duplication fees should be waived.

Thank you for your consideration of this request. As 5 U.S.C. § 552(a)(6)(E)(ii)(I) provides, I will anticipate your determination on our request within ten (10) calendar days.

Respectfully submitted,

Andrew Christy
Law Clerk, EPIC
Christy@epic.org

Ginger McCall
Staff Counsel, EPIC
Mccall@epic.org

3

# Tab A-2

DHS Response, dated August 3, 2011

U.S. **Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

*Privacy Office, Mail Stop 0655*

August 3, 2011

Mr. Andrew Christy
Law Clerk
Electronic Privacy Information Center
1718 Connecticut Avenue NW, Suite 200
Washington, D.C. 20009

Re: **DHS/OS/PRIV 11-1104**

Dear Mr. Christy:

This is the electronic final response to your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS) Privacy Office, dated July 26, 2011, and seeking the following documents:

1. "All contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or any other defense contractors regarding the new NSA pilot program;
2. All contracts and communications with AT&T, Verizon and CenturyLink or any other IPSs regarding the new NSA pilot program;
3. All analyses, legal memoranda, and related records regarding the new NSA pilot program;
4. Any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the new NSA pilot program;
5. Any privacy impact assessment performed as part of the development of the new NSA pilot program."

Your request was received by this office on July, 27, 2011.

As it pertains to item five, a search was conducted in the DHS Privacy Office for records that would be responsive to your request. Unfortunately, we were unable to locate or identify any responsive records. Because this pilot program belongs to another agency, there is no DHS privacy impact assessment.

While an adequate search was conducted, you have the right to appeal this determination that no records exist within the Privacy Office that would be responsive to item number five of your request. Should you wish to do so, you must send your appeal and a copy of this letter, within 60 days of the date of this letter, to: Associate General Counsel (General Law), U.S. Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. § 5.9. Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

The Office of Government Information Services (OGIS) also mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974. If you wish to contact OGIS, you may email them at ogis@nara.gov or call 1-877-684-6448.

Upon further review of your request, I have determined that the information you are seeking, which appears to be overly broad, is under the purview of the DHS National Protection and Programs Directorate (NPPD). Therefore, I am referring your request to the FOIA Officer for NPPD, Lizzy Gary, for processing and direct response to you. NPPD will apprise you regarding the scope of your request. You may contact that office in writing at U.S. Department of Homeland Security, National Protection and Programs Directorate, Washington, D.C. 20528, nppd.foia@dhs.gov, or via telephone at 703-235-2211.

Provisions of the FOIA allow us to recover part of the cost of complying with your request. In this instance, because the cost is below the $14 minimum, there is no charge.

If you need to contact our office concerning this request, please call 866-431-0486 and refer to **DHS/OS/PRIV 11-1104**.

Sincerely,

Linda Lasko
FOIA Program Specialist

# Tab A-3

EPIC Purported Partial Administrative Appeal, dated January 5, 2012

NPPD12F111

# ELECTRONIC PRIVACY INFORMATION CENTER

1718 CONNECTICUT AVENUE NW, SUITE 200
WASHINGTON, D.C. 20009
202-483-1140
FAX 202-483-1248

CONFIDENTIAL – SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION BY OTHER THAN
ITS ADDRESSEE IS STRICTLY PROHIBITED. IF THIS FACSIMILE HAS BEEN RECEIVED IN ERROR,
PLEASE IMMEDIATELY NOTIFY THE SENDER

## TO: LIZZY GARY, FOIA OFFICER

## FROM: AMIE STEPANOVICH

COMPANY:

DHS NPPD

DATE:

1/5/12

RECIPIENT'S FAX NUMBER:

(703) 235-2052

SENDER'S EMAIL:

stepanovich@epic.org

RECIPIENT'S TELEPHONE NUMBER:

SENDER'S TELEPHONE NUMBER:

(202) 483-1140 x120

TOTAL NO. OF PAGES INCLUDING COVER:

11

## COMMENTS:

FOIA Administrative Appeal re: DHS/OS/PRIV 11-1104



January 5, 2011

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

**VIA FAX 703.235.2052**
U.S. Department of Homeland Security
National Protection and Programs Directorate
FOIA Officer: Lizzy Gary
Washington, D.C. 20528
nppd.foia@dhs.gov
703.235.2211

### Re: Freedom of Information Act Appeal (DHS/OS/PRIV 11-1104)

Lizzy Gary:

This letter constitutes an appeal under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the National Protection and Programs Directorate ("NPPD") at the Department of Homeland Security ("DHS") by the Electronic Privacy Information Center ("EPIC").

On July 26, 2011, EPIC requested, via facsimile, agency records regarding a joint program between DHS and the National Security Agency ("NSA") to monitor Internet traffic flowing through certain Internet Service Providers ("ISPs") to a select number of defense contractors. Specifically, EPIC requested the following:

1. All contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman, or any other defense contractors regarding the new NSA pilot program;

2. All contracts and communications with AT&T, Verizon, and CenturyLink or any other ISPs regarding the new NSA pilot program;

3. All analyses, legal memoranda, and related records regarding the new NSA pilot program; and

4. Any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the new NSA pilot program.

5. Any Privacy Impact Assessment performed as part of the development of the new NSA pilot program.

Procedural Background

On July 26, 2011, EPIC transmitted a request for the preceding five categories of documents ("EPIC's FOIA Request"), as well as a request for news media fee status and a waiver of duplication fees.[1]

In a letter dated August 3, 2011, the DHS responded to EPIC's FOIA Request.[2] The DHS stated that the Department was unable to locate documents in response to Category 5 of EPIC's FOIA Request and notified EPIC of the right to appeal that determination.

The DHS informed EPIC that the remainder of EPIC's FOIA Request, Categories 1-4, were being referred, by the agency, to "the FOIA Officer for NPPD, Lizzy Gar r, for processing and direct response." In this letter, the agency made neither made a determination nor requested clarification on the four categories.

EPIC has received no further communication from the DHS in response to EPIC's FOIA Request. EPIC has received no communication from the NPPD in response to EPIC's FOIA Request. 110 working days have passed since the DHS received EPIC's FOIA Request, and 104 working days have passed since the DHS referred EPIC's FOIA Request to the NPPD.

### EPIC Appeals the NPPD's Failure to Disclose Records Responsive to Categories 1-4

EPIC hereby appeals the NPPD's failure to make a timely determination regarding EPIC's FOIA Request. Typically, an agency must make a determination regarding a FOIA request within twenty working days.[3] A "determination" must include at least a list of the documents to which the requester is being denied access and reasons for the withholding. "Denial of this information would in all likelihood be a violation of due process as well as effectively gutting the reasons for applying the exhaustion doctrine in FOIA cases."[4] When a FOIA request is granted expedited treatment, the agency must make a determination within ten working days. Nearly four months have passed since the date that EPIC's FOIA Request was transmitted to the NSA.

An agency's "acknowledgement" of a request "cannot be construed as a 'determination' . . . if it does not grant or deny the right to appeal."[5] Though the DHS has provided a substantive response in reply to Category 5, neither the DHS nor the NPPD have responded to Categories 1-

---

[1] Appendix 1.

[2] Appendix 2.

[3] 5 U.S.C. § 552(a)(6); *see also Wash. Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 74 (D.D.C. 2006) (citing *Payne Enterprises v. U.S.*, 837 F.2d 486, 494 (D.C. Cir. 1998)) (stating, "FOIA was created to foster public awareness, and failure to process FOIA requests in a timely fashion is 'tantamount to denial.'").

[4] 452 F. Supp. 306, 317 n 7 (N.D Texas. 1978) rev'd on other grounds, 613 F.2 1 1314 (5th Cir. 1980); see also *Oglesby v. Dep't of Army*, 920 F.2d 57, 65 (D.C. Cir. 1990) (citing *Shermco Indus., Inc. v. Sec'y of Air Force*, 1 452 F. supp. 306 (N.D. Tex. 1978).

[5] *Martinez v. FBI*, No. 82-1547 (D.D.C. Oct. 11, 1983) (citing *Shermco Indus., Inc., v. Sec'y of Air Force*, 1 452 F. Supp. 306 (N.D. Tex. 1978) and *Marschner v. Dep't of Stat*, 470 F. Supp. 196, 199 (D. Conn 1979)).

4 of EPIC's FOIA Request, and therefore a determination has not been made as to the documents under these categories. The failure to make a determination violates the FOIA.

## EPIC Renews Its Request for "News Media" Fee Status

At this time, EPIC reiterates and renews all arguments that it should be granted "news media" fee status. EPIC is a non-profit, educational organization that routinely and systematically disseminates information to the public. EPIC is a representative of the news media.[6]

EPIC's status as a "news media" requester entitles it to receive requested records with only duplication fees assessed. In addition, because disclosure of this information will "contribute significantly to public understanding of the operations or activities of the government," any duplication fees should be waived.

## Conclusion

Thank you for your prompt response to this appeal. I anticipate that you will produce responsive documents within 20 working days of this appeal. If you have any questions, please feel free to contact me at (202) 483-1140 x 120 or stepanovich@epic.org.

Sincerely,

Amie Stepanovich
EPIC National Security Counsel

/enclosures

> Note: EPIC's January 5, 2012 facsimile contained two appendices: (1) a copy of EPIC's July 26, 2011 FOIA request and (2) a copy of DHS's August 3, 2011 response letter. The appendices have been excluded here because they are attached as separate exhibits to the declaration.

---

[6] *EPIC v. Dep't of Defense*, 241 F. Supp. 2d. 5 (D.D.C. 2003).

# Tab A-4

Email from EPIC Describing Revisions to Scope of FOIA Request,
dated August 31, 2012

**Marcus, Lisa (CIV)**

| | |
|---|---|
| **From:** | Amie Stepanovich <stepanovich@epic.org> |
| **Sent:** | Friday, August 31, 2012 3:08 PM |
| **To:** | Marcus, Lisa (CIV) |
| **Cc:** | Marc Rotenberg; Ginger McCall |
| **Subject:** | Re: EPIC v. DHS |

Lisa,

      Thank you for your email. We are of course surprised that you are contacting us at this point in the litigation to discuss narrowing the scope of EPIC's request, but we are willing to make the following modifications in the FOIA request

(1) Regarding category 3, which you have said constitutes the vast majority of records in this matter, we will agree to narrow the scope of the request to "all legal and technical analyses, including legal memoranda, regarding the DIB cyber pilot."

(2) We further agree to exclude draft documents from the record request.

      Regarding the other proposals to narrow the scope of the request, we do not agree to exclude records containing classified information or records that were not created by the DHS.

Sincerely,
Amie

Amie Stepanovich
Associate Litigation Counsel
Electronic Privacy Information Center
202.483.1140 x104
@astepanovich

Defend Privacy. Support EPIC.
http://www.epic.org/donate/

On Aug 30, 2012, at 5:27 PM, Marcus, Lisa (CIV) wrote:

Hi Amie,

As we discussed on Friday, given the huge volume --- approximately 10,000 page --- of potentially responsive records that the Department of Homeland Security (DHS) has identified, and the length of time that will be required to process so many pages, most of which are classified, DHS asks you to clarify/narrow the scope of EPIC's FOIA request.

Included in this email is: a) more information about the DIB Cyber Pilot that is the subject of EPIC's FOIA request, b) information about which of the categories of EPIC's request constitute the majority of the approximately 10,000 pages of potentially responsive documents that DHS has identified; c) a list of the types/categories of documents DHS has identified as potentially responsive; and d) some suggestions on how the request can be narrowed.  DHS's goal in providing you with this additional information is to allow EPIC to make informed decisions to clarify/narrow the scope of the records EPIC is seeking.

A. **DIB Cyber Pilot.**

Since EPIC initially submitted the FOIA request at issue in this case, a significant amount of information about the DIB Cyber Pilot has become publicly available.  In January, 2012, DHS published a Privacy Impact Assessment (PIA) for the National Cyber Security Division Joint Cybersecurity Services Pilot (JCSP); the JCSP extended the existing operations of the DIB Cyber Pilot and shifted the operational relationship with the Commercial Service Providers in the pilot to DHS.  The PIA document describes the DIB Cyber Pilot and its focus on two cyber threat countermeasures: 1) the ability to block Domain Network System (DNS) traffic to malicious domains (referred to as DNS Sinkholing), and 2) e-mail filtering that would include quarantining incoming infected messages.  It is available here:http://www.dhs.gov/xlibrary/assets/privacy/privacy_nppd_jcsp_pia.pdf.  In May, 2012, the Department of Defense, in partnership with DHS, announced an expansion of Defense Industrial Base (DIB) voluntary cybersecurity information sharing activities.  A press release issued by DoD in May explained that "[a]fter a year-long Defense Industrial Base (DIB) cyber security pilot, the DoD's Voluntary DIB Cyber Security/ Information Assurance (CS/IA) Program is now available to all eligible DIB companies."  Here is a link to the May press release:  http://www.defense.gov/releases/release.aspx?releaseid=15266.  And here is a link to a May 11, 2012 fact sheet entitled "Defense Industrial Base (DIB) Cybersecurity Activities": http://www.defense.gov/news/d20120512dib.pdf.

This information should allow EPIC to tailor its request to those records in which EPIC is specifically interested, rather than requesting overly broad categories of information including 1) "all communications with . . . defense contractors regarding the [DIB Cyber Pilot]," 2) "all communications with . . . [Commercial Service Providers] regarding the [DIB Cyber Pilot]," and 3) "all analyses, legal memoranda, and related records regarding the [DIB Cyber Pilot]."

B. **Information about which of the categories of EPIC's request constitute the majority of the approximately 10,000 pages of potentially responsive documents.**

The vast majority of the 10,000 pages have been identified as potentially responsive to the 3rd category of requested records: "all analyses, legal memoranda, and related records regarding the [DIB Cyber Pilot]."  This is also the broadest category of documents that EPIC has requested.  Within the group of documents that are potentially responsive to the 3rd category, the use of the vague phases "analyses…, and related records" has generated, by far, the most potentially responsive documents.  DHS requests that EPIC identify what types of analyses EPIC seeks.  DHS also requests that EPIC define what is meant by the broad phrase "related record."  In addition, DHS proposes that the scope of this category be limited to responsive records that reflect final agency positions and analyses regarding the DIB Cyber Pilot.

DHS has identified documents potentially responsive to categories 1 and 2.

After conducting a search, DHS has not located any documents that are potentially responsive to category 4 of EPIC's request.  DHS believes that it does not have any Memorandum of Understandings (MOUs) between NSA and DHS or NSA and other entities.

C.   **Here is a list of types of documents that are included in the 10,000 pages:**

Category 1.  DHS has not located any government contracts with defense contractors related to the DIB Cyber Pilot.  DHS has located potentially responsive communications between DHS and government contractors in the form of emails, discussion points, discussion papers or notes. DHS anticipates that a significant amount of materials falling under this category are email communications that are protected by FOIA Exemptions b(1), b(5), and b(6).  While these documents may be responsive to the request, they would most probably be redacted to an extent that renders the usefulness of the documents minimal.  In contrast, the time and resources necessary to review and process these documents would clearly be significant.

Category 2.  DHS has not located any government contracts with Commercial Services Providers (CSPs) related to the DIB Cyber Pilot.  DHS has located potentially responsive communications between DHS and CSPs in the form of emails, discussion points, discussion papers or notes. DHS anticipates that a significant amount of materials falling under this category are email communications that are protected by FOIA Exemptions b(1), b(5), and b(6).  While these documents may be responsive to the request, they would most probably be redacted to an extent that renders the usefulness of the documents minimal.  In contrast, the time and resources necessary to review and process these documents would clearly be significant.

Category 3.  DHS has located potentially responsive emails, discussion papers/points, white papers, meeting notes/agendas, PowerPoint presentations on legal and litigation issues.  These documents are a mix of classified and unclassified, FOUO, Confidential and Proprietary.  Almost all documents will require referral to outside agencies/corporations for consultation.  DHS also may have program milestone documents (i.e., concept of operations, manuals, etc).  DHS anticipates that a significant amount of materials falling under this category are email communications that are protected by FOIA Exemptions b(1), b(5), and b(6).  While these documents may be responsive to the request, they would most probably be redacted to an extent that renders the usefulness of the documents minimal.  In contrast, the time and resources necessary to review and process these documents would clearly be significant.

D.   **Narrowing the scope of the request.**  DHS has identified the following potential ways to narrow the scope of the request in a way that would decrease the burden on DHS while not necessarily decreasing the amount of non-exempt records that would be produced to EPIC.  DHS expects that EPIC may have other ideas on how to clarify or narrow the scope of this request, but here are ideas that have occurred to DHS:

- Since much of the information that DHS has identified as potentially responsive is classified national security information that would be exempt under FOIA exemption b(1), EPIC should consider limiting its request to unclassified materials.

- EPIC should consider limiting the 3rd category of the request to exclude any draft documents.

- EPIC should consider limiting the 3rd category to include only documents that are created by DHS.  Doing so would decrease the time required for DHS to consult with other agencies about potentially responsive records.

- EPIC should better define the words "analyses" and "related records" in the 3rd category to specify what EPIC seeks.  Absent clarification, this request is not reasonably defined.

Again, DHS hopes that the information provided above will allow EPIC to identify with increased particularity those records that it seeks, so that DHS does not waste months of time and significant agency resources processing records that are of little interest to EPIC.  Even if EPIC continues to seek a broad amount of information, DHS proposes that EPIC consider narrowing its request to exclude classified materials and drafts, since classified documents and drafts would most likely be exempt under FOIA categories (b)(1) and (b)(5).

Thank you,
Lisa


**Lisa Zeidner Marcus**
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
(202) 514-3336

# Tab A-5

DHS Final Response Letter, dated April 15, 2013

**U.S. Department of Homeland Security**
Washington, D.C. 20528



# Homeland Security

*Privacy Office, Mail Stop 0655*

April 15, 2013

Sent VIA Electronic Mail

Andrew Christy
Law Clerk
c/o Ginger McCall, Director, Internet Public Interest Opportunities Program
Electronic Privacy Information Center
1718 Connecticut Avenue NW, Suite 200
Washington, D.C. 20009

Re:  **DHS/OS/PRIV 11-1104**

Dear Mr. Christy:

This is our final response to your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), dated July 26, 2011, and assigned the FOIA reference number DHS/OS/PRIV 11-1104.  In an email dated August 31, 2011, sent to our Department of Justice counsel, your counsel, Amie Stepanovich indicated that the Electronic Privacy Information Center ("EPIC") modified your request as follows.[1]  The modified request seeks:

    1-  All contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or any other defense contractors regarding the DIB Cyber pilot;

    2-  All contracts and communications with AT&T, Verizon and CenturyLink or any other IPSs regarding the DIB Cyber pilot;

    3-  All legal and technical analyses, including legal memoranda, regarding the DIB cyber pilot;

    4-  Any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the DIB cyber pilot;

---

[1] The amended version reflects a number of changes.  Your request originally referred to the DIB Cyber Pilot as the "new NSA pilot program," but your counsel has confirmed that the request seeks records regarding what is known as the DIB Cyber Pilot.  Your request initially referred to internet service providers as "IPSs," rather than "ISPs," but we understand your original phrasing to be a typo.  The third category of your request was originally broader and sought "all analyses, legal memoranda, and related records regarding the new NSA pilot program."

5- Any privacy impact assessment performed as part of the development of the DIB cyber pilot.

EPIC also excluded draft documents from the record request, according to Ms. Stepanovich's e-mail.

In a letter from this office, dated August 3, 2011, you were advised that the DHS Privacy Office had conducted a search for records responsive to item 5 of your request, but that we were "unable to locate or identify any responsive records."  You were further advised that you could appeal this determination within 60 days.  You declined to appeal that determination.  Your counsel later confirmed that the relevant items in the related litigation, 12-cv-00333 (D.D.C.), were items 1 through 4.  *See* Joint Meet and Confer Stmt. (May 21, 2012).

Also in the August 3, 2011 letter from this office, you were advised that the remaining items of the request were transferred to the National Protection and Programs Directorate (NPPD).  NPPD conducted a responsive search and later returned potentially responsive documents to this office for processing.

A search for documents responsive to items 1 through 4 of your request produced a total of 2,121 pages.  Of those pages, I have determined that 117 pages of the records are releasable in their entirety, 1,159 pages are partially releasable, and 845 pages are withheld in their entirety pursuant to Title 5 U.S.C. § 552 (b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6),(b)(7)(C), (b)(7)(D), and (b)(7)(E), FOIA Exemptions, 1, 2, 3, 4, 5, 6, b7(C), b7(D), and b7(E).

FOIA Exemption 1 provides that an agency may exempt from disclosure matters that are (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order.

FOIA Exemption 2 protects information applicable to internal administrative personnel matters to the extent that the information is of a relatively trivial nature and there is no public interest in the document.

FOIA Exemption 3 protects information specifically exempted from disclosure by another statute, if the statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a person that is privileged or confidential.  The courts have held that this subsection protects (a) confidential commercial information, the disclosure of which is likely to cause substantial harm to the competitive position of the person who submitted the information and (b) information that was voluntarily submitted to the government if it is the kind of information that the provider would not customarily make available to the public.

FOIA Exemption 5 protects from disclosure those inter- or intra-agency documents that are normally privileged in the civil discovery context.  The three most frequently invoked privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege.   After carefully reviewing the responsive documents, I determined that portions of the responsive documents qualify for protection under the Deliberative Process Privilege, Attorney Work-Product Privilege, and Attorney-Client Privilege**.**  The deliberative process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within inter-agency or intra-agency memoranda or letters.  The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.  The attorney work-product privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation.  The attorney-client privilege protects confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice.   It applies to facts divulged by a client to his attorney, and encompasses any opinions given by an attorney to his client based upon, and thus reflecting, those facts, as well as communications between attorneys that reflect client-supplied information.  The attorney-client privilege is not limited to the context of litigation.

FOIA Exemption 6 exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy.  This requires a balancing of the public's right to disclosure against the individual's right to privacy.  The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information.  Any private interest you may have in that information does not factor into the aforementioned balancing test.  I note that some of the information marked as redacted pursuant to (b)(6) could also be protected pursuant to (b)(2), which protects information "related solely to the internal personnel rules and practices of an agency," including for example internal phone numbers.

Exemption 7(C) protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy.  This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity.  That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation.  Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate.  As such, I have determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information.  Please note that any private interest you may have in that information does not factor into this determination.

Exemption 7(D) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to disclose the identities of confidential sources.

Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

In addition, the names of National Security Agency/Central Security Services (NSA/CSS) employees have been deleted from the enclosures. These deletions are exempt from disclosure pursuant to the third exemption of the FOIA, which provides for the withholding of information specifically protected from disclosure by statute. The specific statute applicable in this case is Section 6, Public Law 86-36 (50 U.S. Code 402 note).

Sincerely,

James Vm Hober, I

# Tab A-6

Email from EPIC and attachment, dated June 20, 2013

| From: | Amie Stepanovich |
|---|---|
| To: | Marcus, Lisa (CIV) |
| Cc: | rotenberg@epic.org; Ginger McCall (mccall@epic.org); Moore, Tamra (CIV) |
| Subject: | Re: EPIC v. DHS - DIB Cyber Pilot FOIA - sufficiency of the search |
| Date: | Thursday, June 20, 2013 9:13:25 PM |
| Attachments: | Bates Pagination.docx |

Lisa -

The attached document is a partial list of bates page numbers that are examples of documents that reference attachments, as per your request. These attachments appear to be responsive to EPIC's FOIA Request but were not included in DHS's production.

I hope this provides the guidance you requested.

Amie Stepanovich

On Jun 17, 2013, at 3:42 PM, Marcus, Lisa (CIV) wrote:

Amie,

When we spoke in mid-May, we discussed DHS's robust search and the issue of whether EPIC intended to challenge the sufficiency of the search.  You relayed that EPIC was generally satisfied with the sufficiency of DHS's search, but that EPIC believed that some documents might be missing from the production.  In particular, you said that EPIC would consider challenging DHS's search on the basis of certain missing documents referenced in the production but apparently, at least to EPIC, not produced --- such as, you explained, an email attachment that was listed in the heading of an email but not itself produced.  You also noted that a document entitled "standard operating procedures" for the DIB Cyber Pilot was referenced in the production but not produced.

As you will recall, I raised the possibilities that such attachments (1) were drafts, (2) were not responsive, or (3) were withheld-in-full (and would thus be reflected on the Vaughn index).

At the time of our call, I asked you to email me examples of any missing attachments or other documents that EPIC believes should have been produced. I haven't heard back from you on this issue.  Nor have I seen myself anything in the production indicating to me that were missing.  Will you please email me by Wednesday a list of documents that EPIC thinks may be missing, and the Bates number that corresponds with any reference to those documents --- including the Bates numbers referencing email attachments which EPIC thinks may be missing, and the Bates number for the page referencing a "standard operating procedures" document that you previously noted --- so that Tamra and I can follow up with DHS and try to get back to you prior

to summary judgment briefing?

Thank you, Lisa

**Lisa Zeidner Marcus**
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Direct dial: (202) 514-3336

**Bates Pagination**

<u>Part 1</u>

00002
00009
00017
00097
00128

<u>Part 2</u>

00150
00155
00157
00159
00204

<u>Part 3</u>

00286

<u>Part 4</u>

00536

<u>Part 5</u>

00626
00804

<u>Part 6</u>

00842

<u>Part 9</u>

01327

# Tab A-7

Supplemental Response Letter, dated August 16, 2013

**U.S. Department of Homeland Security**
Washington, D.C. 20528



*Privacy Office, Mail Stop 0655*

August 16, 2013

Sent VIA Electronic Mail

Andrew Christy, Law Clerk
c/o Ginger McCall, Director, Internet Public Interest Opportunities Program
Electronic Privacy Information Center
1718 Connecticut Avenue NW, Suite 200
Washington, D.C. 20009

Re:  **DHS/OS/PRIV 11-1104**

Dear Mr. Christy:

This is a supplemental response to your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), dated July 26, 2011, and assigned the FOIA reference number DHS/OSIPRIV 11-1104.  In an email dated August 31, 2012, sent to our Department of Justice counsel, your counsel Amie Stepanovich indicated that the Electronic Privacy Information Center ("EPIC") modified your request as follows.[1]  The modified request seeks the following, except for "draft" documents which have been excluded from the request:

1- All contracts and communications with Lockheed Martin, CSC, SAIC, Northrop Grumman or other defense contractors regarding the DIB Cyber Pilot;

2- All contracts and communications with AT&T, Verizon and CenturyLink or any other ISPs regarding the DIB Cyber Pilot;

3- All legal and technical analyses, including legal memoranda, regarding the DIB cyber pilot;

---

[1] The amended version reflects a number of changes.  Your request originally referred to the DIB Cyber Pilot as the "new NSA pilot program," but your counsel has confirmed that the request seeks records regarding what is known as the DIB Cyber Pilot.  Your request initially referred to internet service providers as "IPSs," rather than "ISPs," but we understand your original phrasing to be a typo.  The third category of your request was originally broader and sought "all analyses, legal memoranda, and related records regarding the new NSA pilot program."

4- Any memoranda of understanding between NSA and DHS or any other government agencies or corporations regarding the DIB Cyber Pilot;[2]

As noted, EPIC's modified request excluded draft documents from the record request.

On April 15, 2013, we sent a final response to your FOIA request; included with that response were 1,327 pages of responsive records released in whole or in part.

Included in this supplemental response are 25 pages that were released to you on April 15, 2013. These pages are being rereleased to you on a discretionary basis with fewer redactions applied. The original Bates numbers appear on the revised pages. Also included in this supplemental response are 59 pages that were not previously provided to you. The newly provided documents include Bates numbers 1328 - 1404.

These pages include 26 pages of documents that had been inadvertently excluded from the April 15 production, including the following documents:

- Privacy Impact Assessment for the National Cyber Security Division Joint Cybersecurity Services Pilot (JCSP)

- Memorandum of Agreement Between AT&T and The Department Of Homeland Security (DHS) Office of Cydersecurity and Communications (CS&C)

- Memorandum of Agreement Between CenturyLink and The Department Of Homeland Security (DHS) Office of Cydersecurity and Communications (CS&C)

Also included in the newly provided documents is the following document that DHS previously determined to be a draft document that was not responsive to your request. DHS has reexamined the document and considers it to be a final document that is responsive and should be provided.

- Defense Industrial Base Pilot Cyber Security Plan

Finally, the supplemental release includes the following document that was located after your counsel sent DHS a list of seventeen documents that appeared to EPIC to potentially be missing from the production. My office reviewed the documents noted by your counsel and confirmed that most of the documents listed were non-responsive to your request. This document is one for

---

[2] Your request originally included a fifth category: Any privacy impact assessment performed as part of the development of the DIB Cyber Pilot. In a letter from this office, dated August 3, 2011, you were advised that the DHS Privacy Office had conducted a search for records responsive to item 5 of your request, but that we were "unable to locate or identify any responsive records." You were further advised that you could appeal this determination within 60 days. You declined to appeal that determination. Your counsel later confirmed that the relevant items in the related litigation, 12-cv-00333 (D.D.C.), were items 1 through 4. See Joint Meet and Confer Stmt. (May 21, 2012).

which DHS had previously only located a draft version that was not responsive to the request; but upon your counsel's inquiry, DHS conducted a renewed search and located the final version of the document.

- Letter from the Department of Homeland Security to Senator McCain sharing the Department's views legislation, S. 3454

If you have any questions, please do not hesitate to contact me.

Sincerely,

James V.M.L. Holzer, I, MHR, CIPP/G
Sr. Director, FOIA Operations
Privacy Office
U.S. Department of Homeland Security