UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 12-0333 (GK) |
| | : | |
| THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY | : | |
| | : | |
| Defendant. | : | |
| | : | |

### MEMORANDUM OPINION

Plaintiff Electronic Privacy Information Center ("Plaintiff" or "EPIC") brings this action against Defendant the United States Department of Homeland Security ("the Government" or "DHS") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff sought records concerning the Defense Industrial Base Cyber Pilot ("DIB Cyber Pilot"), a cyber-security pilot program jointly conducted by the United States Department of Defense ("DoD") and Defendant DHS. Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mot. Summ. J.") at 2 [Dkt. No. 53-1].

The program "aim[ed] . . . to protect U.S. critical infrastructure[,] . . . [and] furnished classified threat and technical information to voluntarily participating [] companies or their Commercial Service Providers[]." Id. EPIC, citing concerns from the Department of Justice that the program "[ran] afoul of

-1-

laws forbidding government surveillance of private Internet traffic[,]" filed a FOIA request with DHS seeking records to determine whether the DIB Cyber Pilot program complied with federal wiretap laws. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Mot. Summ. J.") at 2 [Dkt. No. 57-1]. Dissatisfied with DHS's response, EPIC initiated this lawsuit challenging the sufficiency of DHS's search and production.

Thereafter, DHS conducted a search for records responsive to EPIC's request, produced documents to EPIC, and provided a Vaughn Index for all documents that were withheld in full or in part under one of FOIA's several exemptions. 5 U.S.C. § 552(b); see also Defendant's Vaughn Index for Challenged Withholdings ("Vaughn Index") [Dkt. No. 53-4].

The Court held that DHS's search for records responsive to EPIC's FOIA request was sufficient and that the Government met its burden in justifying withholding documents under all but one relevant FOIA Exemption. Memorandum Opinion on Summary Judgment (Aug. 4, 2015) ("2015 Mem. Op.") at 16 [Dkt. No. 68]. The Court ordered DHS to submit a revised Vaughn Index to more fully explain the basis for withholding documents under FOIA Exemption 7(D), id. at 38, which it did on September 30, 2015. Notice of Filing of Supplemental, Revised Vaughn Index ("Supplemental Vaughn Index")

[Dkt. No. 73]. EPIC now seeks attorneys' fees under 5 U.S.C. § 552(a)(4)(E). Memorandum of Points and Authorities in Support of Plaintiff's Motion for Attorneys' Fees and Costs ("Pl.'s Mot.") [Dkt. No. 81-1].

I.    BACKGROUND

A.    FOIA

The Freedom of Information Act ("FOIA"), 5 U.S.C § 552, was enacted by Congress "to ensure an informed citizenry, vital to the functioning of a democratic society." Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992), cert. denied, 507 U.S. 984 (1993) (citing Fed. Bureau of Investigations v. Abramson, 456 U.S. 615, 621 (1982)).

When an agency receives a request for records, the agency must conduct a sufficient search for records within the scope of the request. 5 U.S.C. § 552(a)(3)(A). The agency then must furnish the information in a timely manner, unless the information is precluded from disclosure by one of FOIA's nine exemptions. § 552(b). FOIA's goal is "broad disclosure," and the exemptions must be "given a narrow compass." Milner v. Dep't of Navy, 562 U.S. 562, 571 (2011) (citing U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 151 (1989)).

The agency has the burden of justifying its withholding of a document under a FOIA exemption. Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). To enable the

-3-

Court to determine whether the agency has met its burden, the agency must submit a "Vaughn Index" consisting of affidavits or declarations that "identif[y] the reasons why a particular exemption is relevant and correlate[e] those claims with the particular part of a withheld document to which they apply." Id. (citing Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 146 (D.C. Cir. 2006)); see also Vaughn v. Rosen, 523 F.2d 1136 (D.C. Cir. 1975).

FOIA additionally provides for attorneys' fees in order to encourage FOIA suits that benefit the public and to compensate a complainant for enduring an agency's resistance to complying with FOIA. Barnard v. Dep't of Homeland Sec., 656 F. Supp. 2d 91, 97 (D.D.C. 2009). FOIA provides that a court may award "reasonable attorney fees and other litigation costs reasonably incurred" in FOIA litigation in which the complainant has "substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i).

   B.   Factual Background

      1.   EPIC's FOIA Request and Appeal

On July 26, 2011, EPIC submitted a FOIA request for documents to DHS, as well as requests for news media fee status and a fee waiver. Pl.'s Mot. Summ. J. at 2. EPIC requested records related to the DIB Cyber Pilot program "to monitor Internet traffic flowing through certain Internet Service Providers ("ISPs") from Internet users to a select number of defense contractors." Id. Specifically,

EPIC requested five categories of documents, with the fifth category described as, "[a]ny privacy impact assessment performed as part of the development" of the DIB Cyber Pilot program. Id. at 3.

After receiving a FOIA request, an agency must make a "determination" within 20 working days as to whether to comply with the request. 5 U.S.C. § 552(a)(6)(A)(i). A "determination" must include the scope of the documents that the agency will produce and withhold under FOIA exemptions. Citizens for Responsibility and Ethics in Washington v. Fed. Election Comm'n, 711 F.3d 180, 186 (D.C. Cir. 2013).

The following week, on August 3, 2011, DHS sent a letter to EPIC acknowledging receipt of its FOIA request. Def.'s Mot. Summ. J. at 2. DHS also indicated that it had referred the request to the DHS National Protection and Programs Directorate ("NPPD"). DHS Response at 1-2 [Dkt. No. 58-3]. DHS notified EPIC that no responsive documents had been found for the fifth category and informed EPIC of its right to appeal that determination.

After receiving no further communication regarding its FOIA request, EPIC faxed an administrative appeal approximately 100 days later on January 5, 2012, to the attention of NPPD FOIA Officer Lizzy Gary. EPIC Facsimile at 1-2 [Dkt. No. 57-4]. Under DHS's FOIA regulations, an appeal must be made in writing and received by the Associate General Counsel of DHS within 60 days of

-5-

the date of the agency's "adverse determination." 6 C.F.R. §
5.9(a)(1). EPIC appealed NPPD's failure to respond to categories
1-4 of EPIC's FOIA request, but did not appeal DHS's determination
that it lacked records for category 5 of the request. EPIC
Facsimile at 2.   In its Answer, DHS denied that the January 5,
2012 facsimile constituted a FOIA appeal, Answer ¶ 26-28 [Dkt. No.
7], and its timeliness. Defendant's Statement of Undisputed
Material Facts in Support of its Motion for Summary Judgment
("Def.'s Statement") ¶ 9-10 [Dkt. No. 62-4].

As already noted, the agency must make a determination as to
any appeal within twenty days. 5 U.S.C. § 552(a)(6)(A)(ii). An
adverse determination by the Associate General Counsel will be the
final action, 6 C.F.R. § 5.9(a)(2), and the decision "will be made
in writing," 6 C.F.R. § 5.9(b). On January 23, 2012, a FOIA
Specialist from NPPD contacted EPIC by telephone requesting
additional information with respect to category one of EPIC's FOIA
request. Declaration of Amie Stepanovich ("First Stepanovich
Decl.") ¶ 12 [Dkt. No. 18-1]. EPIC was unable to provide the agency
with further information, and DHS informed EPIC that "DHS was
processing the request," Id.; Def.'s Mot. Summ. J. at 3.

Under FOIA, a person making a request for any records will be
deemed to have exhausted administrative remedies if the agency
fails to comply with the applicable time limit provisions under
FOIA. 5 U.S.C. § 552(a)(6)(C)(i). Arguing that NPPD failed to

comply with FOIA by neither responding to nor producing records for EPIC's FOIA request within the statutory timelines, EPIC filed its Complaint for Injunctive Relief on March 1, 2012. Complaint for Injunctive Relief ("Compl.") ¶ 4 [Dkt. No. 1]. EPIC sought, inter alia, a court order compelling DHS to conduct a search for responsive records within five days and to produce documents within ten days, and attorneys' fees and other relief as "just and proper." Compl. ¶ A-E. DHS filed its Answer on May 1, 2012.

### 2. FOIA Litigation

After DHS filed its Answer, the parties submitted a Joint Meet and Confer Statement, where they agreed that categories 1-4 of EPIC's FOIA request served as the basis of the FOIA litigation, and that EPIC did not appeal DHS's determination that it lacked records responsive to category 5. Joint Meet and Confer Statement ("Joint Statement") ¶ 3 [Dkt. No. 11]. The parties also stated that DHS was conducting a "new search for records" responsive to categories 1-4 of EPIC's FOIA request. Id. ¶ 4. Although the parties agreed that the post-production issues would likely be the sufficiency of DHS's search, the appropriateness of the agency's withholdings, and attorneys' fees, they disagreed as to the appropriate production schedule. Id. ¶ 5, 8.

DHS proposed a two-stage search for responsive records, with stage one focused on gathering responsive records and stage two focused on reviewing the documents for relevance and potential

FOIA Exemptions.  Id. ¶ 6. While DHS proposed a June 27, 2012 deadline for stage one, the agency was unable to propose a stage two deadline due to the need for inter-agency collaboration and the uncertainty as to timing. Id. Nonetheless, DHS stated it could complete its "first production" of responsive records on July 18, 2012. Id. Plaintiff's proposed schedule consisted of "concrete deadlines," with DHS to complete production of documents and the Vaughn Index by August 24, 2012. Id. ¶7.  On May 24, 2012, the Court adopted the Plaintiff's proposed timeline and issued a scheduling order for DHS to complete production of documents and the Vaughn Index by August 24, 2012. Order, May 24, 2012 ("Scheduling Order") [Dkt. No. 12].

After DHS identified approximately 10,000 pages of documents potentially responsive to EPIC's FOIA request, it moved, on the last day of the August 24 deadline, to stay proceedings for ten days to enable the parties to narrow the scope of EPIC's request. Defendant's Motion for a 10-Day Stay of Proceedings ("Def.'s Mot. Stay") at 2-3 [Dkt. No. 13].  DHS argued that the large volume of classified documents potentially responsive to EPIC's FOIA request would require significant review by DHS and other agencies. Id. at 2. DHS noted its intention to move to modify the May 24, 2012 Scheduling Order, but stated that how much additional time it would need would "depend on whether the parties are able to reach agreement on narrowing the scope of the request." Id. at 2-3.

After the Court granted DHS's ten-day stay, DHS moved for a second ten-day stay. Defendant's Motion to Continue Stay of Proceedings for 10 Additional Days ("Def.'s Second Mot. Stay") at 1 [Dkt. No. 14]. Although EPIC had narrowed its FOIA request on August 31, 2012, by excluding draft documents and by limiting the scope of request category three, DHS again sought more time to assess the impact of the narrowed request on the number of potentially responsive document pages. Id. at 2-3. In its second motion, DHS anticipated that it would need to further clarify and narrow EPIC's FOIA request in light of the remaining volume of classified document pages. Id.

EPIC opposed DHS's second motion on the grounds that DHS failed to demonstrate "exceptional circumstances." Plaintiff's Opposition to Defendant's Motion for an Additional 10-Day Stay of Proceedings ("Pl.'s Opp'n Stay") at 3 [Dkt. No. 15]. EPIC noted that DHS had engaged in significant delays in seeking to narrow the scope of EPIC"s request: first, by waiting until the deadline for full production had arrived - August 24, 2012, three months after the May 24 Scheduling Order - before first contacting EPIC; and then, even after the first 10-day stay was granted, waiting almost another week to contact EPIC about further narrowing the FOIA request. Id. EPIC also argued that DHS "failed to provide a date certain by which time any documents might actually be produced." Id. at 5.

After the Court granted the second 10-day stay, Order (Sept. 5, 2012) ("Sept. 5, 2012 Order") [Dkt. No. 16], DHS moved to modify the scheduling order. Defendant's Motion to Modify the Scheduling Order ("Def.'s Mot. to Modify") at 1 [Dkt. No. 17]. DHS stated that the new scope of EPIC's FOIA request only reduced the number of potentially responsive document pages from approximately 10,000 to approximately 9,200, and that EPIC did not agree to further narrow the request. Def.'s Mot. to Modify at 1-2. After estimating that it would take 16 months to review the documents due to EPIC's broad request, the volume of documents, and the need for inter-agency collaboration, DHS proposed a modified schedule with January 17, 2014 as the final due date for all responsive documents. Id. at 3.

EPIC opposed DHS's motion on the grounds that DHS failed to show good cause.  Plaintiff's Opposition to Defendant's Motion to Modify the Scheduling Order and Cross-Motion for Entry of An Order to Show Cause Why Defendant Should Not Be Held in Contempt at 7 [Dkt. No. 18]. EPIC argued that the delays were due to "preventable carelessness" on DHS's part, and that the agency had already been granted multiple stays despite its initial representation that it could produce documents on July 18, 2012. Id. at 4-5, 7. EPIC alo argued that DHS demonstrated bad faith in waiting until the day of the production deadline to ask EPIC to narrow its FOIA request, and that EPIC had agreed to narrow its request because of DHS's

representation that doing so would "facilitate production." Id. at 1, 8.

Although the Court permitted the scheduling order to be modified, it found DHS's proposed final production deadline of January 17, 2014 as "far too far away." Order, Oct. 16, 2012 ("Modified Scheduling Order") at 2 [Dkt. No. 25]. The Court ordered DHS to fully review at least 2,000 document pages per month, "producing to Plaintiff all responsive and unclassified documents," with complete production of documents by March 15, 2013, and the Vaughn Index by May 1, 2013. Id. at 3. The Order also required DHS to submit a monthly report indicating how many document pages it produced to EPIC each month. Id.

In a subsequent order, the Court eliminated the requirement that DHS produce documents on a rolling basis. Order, Jan. 8, 2013 ("Order on Plaintiff's Motion for Reconsideration") at 2-3 [Dkt. No. 39]. Instead, DHS was ordered to produce all responsive documents by April 15, 2013, with the Vaughn Index due by June 1, 2013. Id. DHS was still required to provide a monthly report and to review a minimum number of document pages per month, but this minimum was reduced to 1,500. Id.

On April 15, 2013, DHS produced 1,276 pages of responsive documents to EPIC; 117 pages were released in their entirety and the remaining 1,159 pages were partially redacted pursuant to FOIA Exemptions. Second Declaration of James Holzer ("Second Holzer

Decl.") ¶ 46 [Dkt. No. 53-3]. After receiving several additional extensions from the Court, DHS provided Plaintiff with its preliminary Vaughn Index on June 22, 2013, one day after the June 21, 2013, deadline. Pl.'s Mot. Summ. J. at 4. In total, DHS produced 1,386 pages of documents, some released in full and some redacted, and withheld 362 pages of documents in full under several of FOIA's exemptions. Def.'s Mot. Summ. J. at 1; see also 5 U.S.C. § 552(b).

EPIC filed its Motion for Summary Judgment on August 30, 2013, challenging the adequacy of the search performed by DHS in response to its FOIA request. Pl.'s Mot. Summ. J. at 6. EPIC also alleged that the Government improperly redacted and withheld documents under FOIA Exemptions 1, 3, 4, 5, and 7(D). Id. at 9, 12, 15, 22, 24. The Court held that DHS conducted a sufficient search under FOIA and commended DHS's "meticulous, organized, and thorough" initial search for responsive records. 2015 Mem. Op. at 15-16. The Court also found that the agency was justified in its withholding of documents under Exemptions 1, 3, 4, and 5. Id. at 21, 24, 32, 33.

The only claim on which the Court did not find in favor of Defendant was with regard to documents withheld under Exemption 7(D). The Court held that the Vaughn Index was not sufficiently detailed to justify the Exemption 7D withholding, but permitted DHS to file a revised Vaughn Index. Id. at 33-38. Thus, the Court

granted the majority of the Government's Motion for Summary Judgment, and denied without prejudice only the portion relating to Exemption 7D. Id. at 37-38. The Court denied without prejudice EPIC's Motion for Summary Judgment with regard to Exemption 7D and denied the remainder of EPIC's Motion for Summary Judgment. Id. In sum, no portion of EPIC's Motion for Summary Judgment was granted. DHS produced a revised Vaughn Index on September 30, 2015 [Dkt. No. 74], which Plaintiff did not challenge.

The filing of the revised Vaughn Index thereby resolved all issues in dispute except costs and attorneys' fees. Joint Status Report ("Joint Report") at 1 [Dkt. No. 76].

## C. Procedural Background

The parties now dispute EPIC's Motion for Attorneys' Fees and Costs, filed on February 5, 2016. Pl.'s Mot. [Dkt. No. 81-1]. On March 9, 2016, DHS filed its Opposition. Defendant's Opposition to EPIC's Motion for Attorney Fees and Costs ("Def.'s Opp'n") [Dkt. No. 86]. On March 22, 2016, EPIC filed its Reply. Reply in Support of Plaintiff's Motion for Attorneys' Fees and Costs ("Reply") [Dkt. No. 87].

## II. STANDARD OF REVIEW

A court may award "reasonable attorney fees and other litigation costs reasonably incurred" in the course of FOIA litigation in which the complainant has "substantially prevailed." 5 U.S.C. § 552(a)(4)(E). Even though the award of attorneys' fees

-13-

and costs is within the Court's discretion, a complainant must be both "eligible" for and "entitled" to attorneys' fees. See Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 524 (D.C. Cir. 2011).  In order to be "eligible" for attorneys' fees, a complainant must "substantially prevail[]" in the litigation. Id. A complainant may "substantially prevail" by obtaining relief through a "judicial order, or an enforceable written agreement or consent decree"[1] or by obtaining a "voluntary or unilateral change in position" by the agency. [2] 5 U.S.C. § 552(a)(4)(E)(ii)(I)-(II).

To determine whether a complainant is "entitled" to attorneys' fees, the Court considers factors, including, but not limited to: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." McKinley v. Fed. Hous. Fin. Agency, 739 F.3d 707, 711 (D.C. Cir. 2014) (citations omitted).

The party seeking fees has the additional burden of establishing the reasonableness of the fees requested. Barnard, 656 F. Supp. 2d at 97.  The complainant must provide supporting

---

[1] The Court will refer to this first theory of eligibility as the "judicial order" theory.

[2] This theory of eligibility is often referred to as the "catalyst theory."

documentation that is sufficiently detailed "to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." Id., (quoting Role Models America, Inc. v. Brownlee, 353 F.3d 962, 975 (D.C. Cir. 2004)).

III. Analysis

A.   Plaintiff's Eligibility for Attorneys' Fees

EPIC argues that it is "eligible" under both the "judicial order" and the "catalyst" theories. Pl.'s Mot. at 6-8; Reply at 3-11.

1.   Plaintiff's Eligibility under the "Judicial Order" Theory

EPIC argues that the following Orders issued by the Court support its eligibility for attorneys' fees under the "judicial order" theory: (1) the May 24, 2012, Scheduling Order, the Oct. 16, 2012, Modified Scheduling Order, and the Jan. 8, 2013, Order on Plaintiff's Motion for Reconsideration; and (2) the Court's Order on the parties' cross motions for summary judgment ("Summary Judgment Order")[Dkt. No. 67]. Pl.'s Mot. at 6-7. DHS argues that none of the Orders issued in this litigation establish that EPIC is eligible for attorneys' fees. Def.'s Opp'n at 5-9.

a. Orders Requiring Production

The Court begins with Plaintiff's argument that it substantially prevailed in this litigation as a result of the

issuance of the Court's Scheduling Order, the Modified Scheduling Order, or the Order on Plaintiff's Motion for Reconsideration.

A FOIA plaintiff substantially prevails when "awarded some relief on the merits of [its] claim" in the form of a judicial order that "change[s] the legal relationship between the plaintiff and defendant." Judicial Watch, Inc. v. FBI, 522 F.3d 364, 367-68 (D.C. Cir. 2008) (citing Davy v. Central Intelligence Agency, 456 F.3d 162, 165-66 (D.C. Cir. 2006) ("Davy I") (internal quotation marks omitted)). An order that requires an agency to produce documents by a date certain changes the legal relationship between the parties, because prior to the order, the agency "[is] not under any judicial direction to produce documents by specific dates," whereas after the order, the agency must do so or be subject to the sanction of contempt. Id. at 368 (citing Davy I, 456 F.3d at 166).

For example, in Judicial Watch an agency refused to release documents responsive to a FOIA request, withholding them pursuant to one of the FOIA Exemptions. 522 F.3d at 366. After the FOIA requestor filed suit, the agency and the requestor entered into a stipulation, whereby the agency would release the responsive documents by a date certain, and the district court approved the stipulation in a court order. Id. The Court of Appeals held that the plaintiff substantially prevailed as a result of the orders

because the orders required the agency to produce documents by a date certain, and thereby changed the legal relationship between the parties. Id. at 367-68.

Similarly, the courts in this District have repeatedly held that a FOIA plaintiff substantially prevails where a court issues a scheduling order requiring an agency to produce responsive documents by a date certain. See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice, 820 F. Supp. 2d 39, 44 (D.D.C. 2011); Elec. Privacy Info. Ctr. v. FBI, 72 F. Supp. 3d 338, 344-345 (D.D.C. 2014); Judicial Watch, Inc. v. DOJ, 774 F. Supp. 2d 225, 228-229 (D.D.C. 2011). This is true even where the scheduling order adopts the production schedule proposed by the Government, rather than the one proposed by the plaintiff. Citizens for Responsibility & Ethics in Washington, 820 F. Supp. 2d at 44.

The Scheduling Order in this case is virtually indistinguishable from the orders issued in Judicial Watch and Davy I, as the Scheduling Order required the "Defendant's Complete Production of Documents" by a date certain, August 24, 2012. Scheduling Order at 1. It "provide[d] [Plaintiff] with the precise relief [her] complaint sought," namely, that DHS produce all documents responsive to EPIC's FOIA request. See Judicial Watch, 522 F.3d at 367. Consequently, the Scheduling Order changed the

legal relationship between the parties and EPIC substantially prevailed in this litigation as a result of its issuance.

The Government argues that the relief granted in the Scheduling Order – a requirement that it produce documents by a date certain - is "just a matter of court procedure". Opp'n at 6 (citing Edmonds v. F.B.I., 417 F.3d 1319, 1323 (D.C. Cir. 2005). The Government has repeatedly raised this argument in courts in this District and this Circuit, and both have just as repeatedly rejected it. See Judicial Watch, 774 F. Supp. 2d at 229 ("DOJ's response—that the Court's order was merely procedural because it did not rule on the merits of [plaintiff's] claim—is an argument that the D.C. Circuit has repeatedly rejected.") (citing inter alia Judicial Watch, 522 F.3d 364, and Davy I, 456 F.3d 162). The Court of Appeals' words are apt: "the government's decision to dust off a thoroughly discredited argument and present it to [the Court] anew wastes both [the Court's] time and the government's resources." Judicial Watch, 522 F.3d at 370.

Therefore, the Court finds that the Plaintiff substantially prevailed in this litigation as a result of the issuance of the Scheduling Order, and consequently, that it is eligible for attorneys' fees.[3]

---

[3] Whether the Modified Scheduling Order and the Order on Plaintiff's Motion to Reconsider also changed the legal relationship between

b. **Summary Judgment Order**

In contrast, the Court did not find in favor of EPIC on a
single issue in the Summary Judgment Order.   The Court merely
required DHS to supplement its Vaughn index by providing additional
justification for its withholdings under Exemption 7D and no
additional documents were produced.   Thus, EPIC did not
substantially prevail as a result of the Summary Judgment Order.
See Campaign for Responsible Transplantation v. Food & Drug Admin.,
511 F.3d 187, 196 (D.C. Cir. 2007) (orders requiring an agency to

---

the parties is a closer question.   These later orders are very
similar to the Scheduling Order and the orders in Judicial Watch,
522 F.3d at 370, and Davy I, 456 F.3d 162, in that they also impose
a requirement that DHS produce responsive documents by a date
certain.   However, these obligations could be viewed as merely
procedural because the obligation to produce already existed and
these later orders simply changed the date of production.

Alternatively, the Modified Scheduling Order and the Order
on Plaintiff's Motion to Reconsider could be viewed as changing
the legal relationship between the parties because they brought
the Government out of a state of non-compliance with the Court's
prior Scheduling Order.   As noted above, the Government had
failed to produce responsive documents by the August 24, 2012,
deadline established in the Scheduling Order.   Thus, as of
August 24, 2012, the Government was out of compliance with an
order of this Court and was potentially subject to contempt.
The later orders established new deadlines, brought the
Government out of a state of non-compliance, and removed the
possibility of a contempt sanction, and thereby could be said to
have changed the legal obligations of the Government.

As the Plaintiff substantially prevailed in this litigation
as a result of the issuance of the Scheduling Order, it is
unnecessary to resolve the question of whether it also
substantially prevailed as a result of the issuance of either
the Modified Scheduling Order or the Order on Plaintiff's Motion
for Reconsideration.

create or supplement a Vaughn index "are not properly understood
as relief on the merits.").

    Consequently, under the judicial order theory, EPIC is
eligible for attorneys' fees because it substantially prevailed in
this litigation only as a result of the issuance of the Scheduling
Order.

        **2. Plaintiff's Eligibility under the "Catalyst" Theory**

    EPIC also argues that it is eligible for attorneys' fees under
the "catalyst theory" because its FOIA litigation substantially
caused DHS to produce documents. Pl.'s Mot at 7-8; Reply at 8-11.
Specifically, EPIC argues that: (1) DHS changed its position when
it released documents responsive to EPIC's FOIA request after
stating earlier in its Answer that EPIC was not entitled to the
relief sought; and (2) EPIC's lawsuit caused DHS to process records
more quickly than it would have without the litigation.  Reply at
9-11.   DHS counters that the agency was actively responding to
EPIC's FOIA request at the time EPIC filed its Complaint and that
DHS would have produced records without EPIC's litigation. Def.'s
Opp'n at 9-11. DHS contends that the agency's "unavoidable delay
was caused by the scope of EPIC's request and a time-consuming,
diligent administrative process[,]" not EPIC's litigation.  Id. at
10-11.

    When determining whether a plaintiff's FOIA suit was a
"catalyst" for the release of responsive documents, the Court must

determine whether the plaintiff demonstrated that the lawsuit was necessary to ensure the agency's compliance with FOIA. Cox v. U.S. Dep't of Justice, 601 F.2d 1, 6 (D.C. Cir. 1979). A plaintiff's recovery under the "catalyst theory" "thus turns on causation." Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice, 83 F. Supp. 3d 297, 303 (D.D.C. 2015), overruled on other grounds as recognized in National Security Counselors v. Central Intelligence Agency, 811 F.3d 22, 29 (D.C. Cir. 2016).

While "[t]he mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation," a significant delay by the agency in complying with FOIA may provide the "inference that the agency forgot about, or sought to ignore, a FOIA requester's request – and in such a case an award of [FOIA] costs and fees would be appropriate." Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1496 (D.C. Cir. 1984); Harvey v. Lynch, 14-cv-784, 2016 WL 1559129, at *3 (D.D.C. Apr. 18, 2016). Indeed, an agency's "sudden acceleration" in processing a FOIA request may lead to the conclusion that the lawsuit substantially caused the agency's compliance with FOIA. Terris, Pravlik & Millian, LLP v. Centers for Medicare and Medicaid Services, 794 F. Supp. 2d 29, 38 (D.D.C. 2011).

Conversely, "[w]hen disclosure is triggered by events unrelated to the pending lawsuit, the causal nexus is missing and

the plaintiff cannot be deemed a 'prevailing party.'" <u>Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice</u>, 83 F. Supp. 3d at 303 (citing <u>Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Justice</u>, 750 F.2d 117, 119-21 (D.C. Cir. 1984)). To determine if extrinsic factors, rather than the plaintiff's lawsuit, caused the agency's release of documents, the Court looks to the circumstances including but not limited to: (1) "whether the agency made a good faith effort to search out material and pass on whether it should be disclosed"; (2) "whether the scope of request caused delay in disclosure"; and (3) "whether the agency was burdened with other duties that delayed its response." <u>Conservation Force v. Jewell</u>, 12-cv-1665, 2016 WL 471252, at *7 (D.D.C. Feb. 5, 2016) (quoting <u>ACLU v. U.S. Dep't of Homeland Sec.</u>, 810 F. Supp. 2d 267, 274 (D.D.C. 2011)).

First, the Court must examine the circumstances around DHS's release of records to determine whether EPIC's lawsuit caused the release, and whether DHS had demonstrated good faith and diligence in responding to EPIC's FOIA request. While this Court described DHS's ultimate search for documents as "meticulous, organized, and thorough," the record also demonstrates that prior to the filing of EPIC's lawsuit on March 1, 2012, DHS had accomplished little in processing EPIC's FOIA request.    2015 Mem. Op. at 15-16.

After EPIC filed its FOIA request on July 26, 2011, DHS acknowledged receipt on August 3, 2011.    Thereafter, EPIC heard

nothing further and finally filed its appeal on January 5, 2012. DHS describes its actions in the four months between receiving EPIC's FOIA request and the January 5, 2012 appeal, as having "tasked out the search" to NPPD's Office of Cybersecurity and Communications (CS&C) and that there "had been discussions between NPPD and CS&C regarding the appropriate way to proceed with the FOIA request given the broad scope." Declaration of James Holzer in Support of Defendant's Motion for Relief from the Court's Order of May 24, 2012 ("First Holzer Decl.") ¶ 13 [Dkt. No. 17-1]. These bureaucratic descriptions give very little insight into what, if any, concrete steps the agency was taking to address EPIC's FOIA request. After EPIC filed an appeal on January 5, 2012, DHS and EPIC had a brief conversation about the request, but it too was devoid of details and DHS did not communicate a plan of action or timeline for responding to the request. See supra, 5-6.

DHS conceded that the agency "accelerated" the search for responsive records after EPIC filed its Complaint in this Court on March 1, 2012. Id. ¶ 18. Specifically, in April of 2012, the NPPD FOIA Office developed a "renewed search plan" by meeting with subject-matter experts who identified the NPPD subcomponent offices likely to have responsive records and tasking these subcomponent offices with conducting electronic and physical record searches. Id. Additionally, the parties stipulated in their

Joint Statement on May 21, 2012, that DHS had informed EPIC that it was "conducting a new search" for records. Joint Statement ¶ 4.

Although DHS points to these activities to demonstrate its diligence in responding to EPIC's FOIA request, they simply do not pass muster when compared with other decisions of the District courts. In Harvey, 2016 WL 1559129, at *2-3, the plaintiff was not eligible for attorneys' fees under the "catalyst theory" becauase the defendant Bureau of Prisons provided sufficient evidence (in the form of a declaration from a BOP analyst) that the "bulk of the work to process" plaintiff's FOIA request was completed before the plaintiff filed its FOIA suit. Here, DHS makes no such assertion, and it is unclear whether its employees had done anything more than have internal conversations about the request prior to EPIC's lawsuit.

Similarly, in Short v. U.S. Army Corps of Engineers, 613 F. Supp. 2d 103, 107 (D.D.C. 2009), the plaintiff was not entitled to attorneys' fees under the "catalyst theory" because the defendant agency had made a determination to grant the plaintiff's FOIA request before the plaintiff filed suit and the agency was actively responding to the request. In this case, while DHS acknowledged receipt of EPIC's FOIA request, it did not make a "determination" under FOIA as to whether to comply with EPIC's request. Even if DHS had made a determination, its extensive delays suggest that it was not diligently responding to EPIC's request.

The second factor to be considered addresses the scope of the plaintiff's request and whether the scope caused the delay. While the scope of EPIC's FOIA request was broad, the Court finds that DHS failed to address its scope in a diligent manner. When DHS sent a letter to EPIC, acknowledging receipt of the FOIA request, it noted that the request was "overly broad." However, DHS never expressed a desire to narrow the request for more than an entire year after EPIC made its request. Instead, DHS waited until August 24, 2012, the deadline for DHS's complete production of documents in this lawsuit to first request that EPIC narrow its request. This delay was despite the fact that the agency had already gathered 16,000 pages of documents potentially responsive to EPIC's FOIA request in July of 2012. First Holzer Decl. ¶ 23.

As EPIC notes, August 24, 2012, was an unnecessarily late date upon which to begin the discussion of narrowing EPIC's FOIA request. Pl.'s Opp'n Mot. Stay. at 3. Unlike the defendant in Bigwood v. Defense Intelligence Agency, 770 F. Supp. 2d 315, 321 (D.D.C. 2011), who searched for and reviewed responsive documents and asked the plaintiff to narrow the scope of its FOIA request before the plaintiff filed its suit, in this case DHS waited until the Scheduling Order's production deadline to inform the Court at that late date of its intention to work with EPIC to narrow the scope of the search.

Finally, while DHS has provided evidence that it faced certain backlogs and administrative difficulties, these representations do not sufficiently demonstrate that it would have produced records without EPIC being forced to file this lawsuit. DHS explains that in the three years preceding EPIC's request, NPPD had seen a five-fold increase in FOIA requests. First Holzer Decl. ¶ 17. At the time of EPIC's request, three NPPD FOIA employees were responding to hundreds of other FOIA requests, on a first-in, first-out basis, and approximately 180 FOIA requests were ahead of EPIC's for processing. Id. ¶ 12. Regarding other administrative difficulties, DHS represents that the need for line-by-line review, extensive cross-agency collaboration, and segregation of unauthorized information delayed final review of responsive documents. Id. ¶¶ 31-34.

Finally, given that EPIC requested both classified and unclassified information, DHS argues that it needed to identify staff who had the proper security clearances to search classified records systems. Id. ¶ 22. Despite these administrative challenges, DHS represented to the Court at the May 24, 2012 status conference that DHS would be able to complete its first production of documents on July 18, 2012, when, in fact, it would later seek to postpone the production deadline by a year and a half. See supra, 10. DHS also failed to communicate these administrative

hurdles to EPIC prior to the lawsuit or provide EPIC with any sort of timeline.

In sum, the Court finds that DHS's lack of transparency regarding its response to EPIC's FOIA request, along with the Court's multiple stays, the Scheduling Order, the Modified Scheduling Order, and the Order on Plaintiff's Motion for Reconsideration, requiring that DHS review a specific number of documents per month, support a finding that EPIC's lawsuit caused DHS to release responsive records and that it thereby substantially prevailed in this litigation. Indeed, given these facts, it is hard to believe that DHS would ever have gotten the job done without the Court's supervision.

### B.   Plaintiff's Entitlement to Attorneys' Fees

Having found Plaintiff eligible for attorneys' fees, the Court must now determine if EPIC is also entitled to them. In determining whether a complainant is "entitled" to attorneys' fees, the Court considers, among others, the following factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." McKinley, 739 F.3d at 711 (citations omitted). The parties dispute all four factors.

1.   **The public benefit derived from EPIC's FOIA lawsuit**

The Court first considers the public benefit derived from Plaintiff's lawsuit.  When determining the public benefit, a court "evaluate[s] the specific documents at issue in the case at hand" and determines whether the plaintiff's lawsuit "is likely to add to the fund of information that citizens may use in making vital political choices." Cotton v. Heyman, 63 F.3d 1115, 1120 (D.C. Cir. 1995). The Court of Appeals recently held that when determining the public benefit, a court must assess "the potential public value" of the information sought, and not the "public value of the information received." Morley v. Central Intelligence Agency, 810 F.3d 841, 844 (D.C. Cir. 2016) (stating that the "public-benefit factor requires an *ex ante* assessment"). The Court of Appeals reasoned that "shifting to the plaintiff the risk that the disclosures would be unilluminating" would defeat the purpose of FOIA's fee-shifting scheme. Id. "To have 'potential public value,' the request must have at least a modest probability of generating useful new information about a matter of public concern." Id. (internal citations omitted).

EPIC argues that cybersecurity is an issue of national importance and that the information obtained through EPIC's FOIA request directly contributed to the debate over cybersecurity and privacy. Pl.'s Mot. at 9-10. DHS argues that EPIC's lawsuit not only failed to contribute new information to the public, but rather

detracted from the national debate by disseminating false information. Def.'s Opp'n at 16-17.

Obviously, issues of national security and privacy are of enormous public importance. Under Cotton, EPIC has shown that its lawsuit "add[ed] to the fund of information that citizens may use in making vital political choices." 63 F.3d at 1120. EPIC cites to articles and commentary featuring information obtained because of EPIC's FOIA suit. Pl.'s Mot. at 9-10. And under Morley, EPIC has shown that its FOIA request had "at least a modest probability of generating useful new information about a matter of public concern." 810 F.3d at 844.

EPIC argues that its FOIA request did in fact produce new information that contributed to the public benefit by revealing "important details about the government's cyber surveillance programs." Pl.'s Mot. at 10. DHS disputes the public benefit of the information, arguing that much of the information was previously provided to the public and any new information, at most, "provide[d] marginal and unimportant information." Def.'s Opp'n at 15-16, 16 n. 11.

The Court need not get into the details of whether the information EPIC acquired was actually new or important, as it has already found that its request was likely to generate new and useful information. The Court does note that much of the public information DHS cites was not public at the time of EPIC's FOIA

request, id. at 15-16, and the fact that it was later made public strengthens EPIC's argument that it was of public import. For these reasons, the Court finds that EPIC's FOIA request satisfies the public benefit factor.

### 2. The commercial benefit to EPIC and EPIC's interest in the records

The second factor, commercial benefit to the plaintiff, and the third factor, the nature of the plaintiff's interest in the records, are often analyzed together to determine whether the plaintiff has a "sufficient private incentive to seek disclosure of the documents without expecting to be compensated for it." McKinley, 739 F.3d at 711 (internal quotations and citation omitted).

Regarding the commercial benefit, EPIC states that it is a "501(c)(3) non-profit public interest research center." Pl.'s Mot. at 11. DHS cites Nat'l Sec. Archive v. U.S. Dep't of Defense, 530 F. Supp. 2d 198 (D.D.C. 2008), and Alliance for Responsible CFC Policy, Inc. v. Costle, 631 F. Supp. 1469 (D.D.C. 1986), for the proposition that 501(c)(3) nonprofits are not automatically considered non-commercial interests. Def.'s Opp'n at 17.

The Defendant's argument is not convincing. First, Nat'l Sec. Archive is of limited relevance, as it dealt with attorneys' fees for litigation over a non-profit seeking preferred fee status under FOIA; it did not involve a FOIA request for documents. 530 F. Supp. 2d at 200. Second, while it is true that 501(c)(3)

nonprofit status does not automatically signal a non-commercial interest, Costle actually supports EPIC's position, citing to FOIA's legislative history that "nonprofit public interest group[s]" are "usually allow[ed] recovery of fees" as opposed to "large corporate interests or a representative of such interests." Costle, 631 F. Supp. at 1471. The plaintiffs in Costle were chlorofluorocarbon producers who had formed the non-profit, and the court found that their motivation was primarily personal interest. That is not the case with EPIC.

DHS then argues that because EPIC's newsletter distributing information obtained through its FOIA lawsuit featured a link for donations, the commercial benefit and interest in the records weigh against EPIC. Def.'s Opp'n at 17. However, a link for donations does not transform a nonprofits' interests from public interest to commercial or self-interest.

Regarding the Plaintiff's interest in the records, "FOIA suits which are motivated by scholarly, journalistic, or public interest concerns are the proper recipients of fee awards." Costle, 631 F. Supp. at 1471. Here, EPIC has consistently represented that it sought the records to address concerns about the DIB Cyber Pilot Program "[running] afoul of law forbidding government surveillance of private Internet traffic," and to determine whether the program "complied with federal wiretap laws." Pl.'s Mot. Summ. J at 2.

Additionally, EPIC has distributed this information to the public, corroborating its stated intention.

For these reasons, the Court finds that the second and third factors of the entitlement determination weigh in favor of EPIC.

### 3. The Reasonableness of DHS's Withholding

The final factor in determining a plaintiff's entitlement to attorneys' fees under FOIA is the reasonableness of the agency's withholdings. McKinley, 739 F.3d at 711. To determine the reasonableness of the agency's withholding, the Court considers two factors.

The first factor is whether the agency's opposition to disclosure "had a reasonable basis in law." Davy v. Central Intelligence Agency, 550 F.3d 1155, 1162 (D.C. Cir. 2008) ("Davy II") (citations omitted). "If the Government's position is correct as a matter of law, that will be dispositive. If the Government's position is founded on a colorable legal basis in law that will be weighed along with other relevant considerations in the entitlement calculus." Davy II, 660 F.3d at 1162 (citations omitted). The second factor is whether the agency was "'recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'" Id. (quoting LaSalle Extension Univ. v. Fed. Trade Comm'n, 627 F.2d 481, 486 (D.C. Cir. 1980)).

Under either factor, the agency carries the burden of showing it behaved reasonably. Davy II, 660 F.3d at 1163. "The question

is not whether [the Plaintiff] has affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [the Plaintiff] filed suit." Id.

The Government argues that it was "correct as a matter of law" because the Court granted in part the agency's Motion for Summary Judgment. Opp'n at 12. This argument is squarely foreclosed by Davy II. In that case, just as in this, the agency failed to substantively respond to a FOIA request, was subsequently sued and then ordered to produce responsive documents.[4] Davy II, 660 F.3d at 1158. In that case, just as in this, the agency completed court-ordered production and then moved for summary judgment, arguing that the scope of its search was sufficient, and prevailed.[5] Id. Despite the fact that the Government prevailed at summary judgment, the Court of Appeals still held that the plaintiff was entitled to attorneys' fees. Id. at 1163. Consequently, the Government's argument that Plaintiff is

---

[4] As described previously, EPIC requested five distinct categories of documents. Prior to the initiation of this lawsuit, DHS's only substantive response was to inform EPIC that it lacked documents responsive to category five. DHS failed to make any similar determination with regard to any of the other four categories of documents included in EPIC's request. Indeed, DHS failed to communicate anything of substance to Plaintiff regarding the other four categories of documents requested.

[5] The trial court held that "the scope of the agency's search was reasonable and that the FOIA exemptions it asserted were valid." See Davy I, 456 F.3d at 164.

ineligible simply because the Government prevailed on its Motion for Summary Judgment is wholly without merit.

Additionally, Davy II makes clear that an agency lacks a colorable basis in law where it does not respond to a FOIA request until after a lawsuit has been filed. Id. "For the agency to receive the benefit of the fourth factor it must present at least a 'colorable basis in law' for its failure to respond" to a FOIA request and "[i]t is not enough to say that 'once the agency faced a justiciable FOIA claim, it offered no resistance.'" Id.

In this case, beyond acknowledging receipt of the request, DHS failed to respond in any meaningful way to EPIC's FOIA request prior to the initiation of this lawsuit. Additionally, the Government has failed to present evidence demonstrating that it "had a reasonable basis for failing to respond," and therefore cannot carry its burden to show it had a colorable basis in the law. Id.

Addressing the second factor of recalcitrance, DHS argues that any delay in production was a result of its "diligent, continued, meticulous, time-consuming efforts." Def.'s Opp'n at 13. EPIC counters that "the agency's delays were a direct product of the agency's heel-dragging and intransigence." Reply at 13.

In evaluating the reasonableness of the agency's withholdings and it recalcitrance with regard to the production of documents, the Court finds that this factor favors EPIC. While DHS had begun

-34-

discussing EPIC's FOIA request prior to EPIC's lawsuit, the Court has had to hold DHS's hand throughout the production process by issuing two Scheduling Orders, both of which required that DHS review a minimum number of document pages per month, as well as several Orders granting the Government extensions of time.

Having found that all four entitlement factors favor EPIC, the Court holds that EPIC is entitled to attorneys' fees.

## C.   The Reasonableness of Plaintiff's Attorneys' Fees

The parties next contest the reasonableness of the attorneys' fees and costs sought by EPIC.  As noted earlier, under FOIA, the Court "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred." 5 U.S.C. § 552(a)(4)(E)(i). The Court has considerable discretion in awarding attorneys' fees. Fenster v. Brown, 617 F.2d 740, 742 (D.C. Cir. 1979). The Court determines the award by calculating the "lodestar" – the number of hours reasonably expended multiplied by a reasonable hourly rate. Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc., 136 F.3d 794, 801 (D.C. Cir. 1998). The fee applicant bears the burden of demonstrating the reasonableness of both the number of hours and the hourly rate. Role Models Am., Inc. v. Brownlee, 353 F.3d at 970.

The fee applicant must provide "contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." Nat'l Ass'n of Concerned Veterans v. Sec'y of

-35-

Defense, 675 F.2d 1319, 1327 (D.C. Cir. 1982). A fee applicant can meet its burden by providing affidavits, declarations, and billing records. Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1517 (D.C. Cir. 1988). Thereafter, the burden shifts to the defendant to rebut the presumption of reasonableness with specific evidence. Covington v. Dist. of Columbia, 57 F.3d 1101, 1109 (D.C. Cir. 1995). Finally, the Court retains discretion to adjust the lodestar amount based on other relevant factors. See Weisberg, 745 F.2d at 1499-1500.

### 1.   The reasonableness of EPIC's billing rate

The Government argues that the various hourly rates sought by EPIC are unreasonable. Opp'n at 19-21.

A reasonable hourly fee is determined by the "prevailing market rate in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel." Blum v. Stenson, 465 U.S. 886, 895 (1984). The Court considers three elements when determining reasonable hourly fees: (1) the attorneys' billing practices; (2) the attorneys' skill, experience and reputation; and (3) the prevailing market rate in the relevant community." Salazar v. Dist. of Columbia, 809 F.3d 58, 62 (D.C. Cir. 2015) ("Salazar IV") (citing Covington, 57 F.3d at 1107).

Government or public interest attorneys who do not have a standard billing rate may utilize the so-called Laffey Matrix to establish the prevailing market rate. See Laffey v. Nw. Airlines,

-36-

Inc., 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, Laffey v. Nw. Airlines, Inc., 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds en banc by* Hodel, 857 F.2d 1516.  The Laffey Matrix was developed over thirty years ago and therefore requires adjustment for inflation. See Salazar IV, 809 F.3d at 62.  The Laffey Matrix provides a schedule of fees for lawyers who practice complex federal litigation based on the number of years of an attorneys' experience. See id.; also Eley v. District of Columbia, 793 F.3d 97, 100-01 (D.C. Cir. 2015).  While the parties agree that the Laffey Matrix should be adjusted for inflation, they disagree over what inflation metric should be used to make the adjustment.

EPIC urges the Court to apply the "LSI Laffey Matrix," which the Legal Services Index ("LSI") of the Consumer Price Index (CPI), calculates by the U.S. Department of Labor Bureau of Labor Statistics, to update the Laffey Matrix. Pl.'s Mot. at 13.  In contrast, DHS argues that the Court should apply the "USAO Laffey Matrix," which is updated by the U.S. Attorneys' Office in Washington, D.C., based on the CPI for the entire Washington, D.C. area. Def.'s Opp'n at 19-20.

The USAO Laffey Matrix adjusts for inflation based on the cost of consumer goods in the Washington, D.C. area, whereas the LSI Laffey Matrix adjusts on a national basis for inflation based on the cost of legal services.  Salazar v. Dist. of Columbia, 123

F. Supp. 2d 8, 14-15 (D.D.C. 2000) ("Salazar I"). There is a stark difference in the results of the two different approaches.  For the second half of 2011, an attorney with twenty or more years of experience earns $734.00 per hour under the LSI Laffey Matrix compared to $475.00 per hour under the USAO Laffey Matrix. See Declaration of Michael Kavanaugh at 28 [Dkt. No. 81-3]; Declaration of Dr. Laura A. Malowane at 6 [Dkt. No. 86-4].

Given these stark financial differences, parties in FOIA cases have vigorously contested which matrix to use, and judges in this District have differed as to which is more appropriate.  See e.g. Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice, 142 F. Supp. 3d 1 (D.D.C. 2015) (using the USAO Laffey Matrix in a FOIA case); Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice, 11-cv-374, 2016 WL 554772, at *1 (D.D.C. Feb. 11, 2016) (using the LSI Laffey Index in a FOIA case); Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 13-cv-260, 2016 WL 3919810, at *3 (D.D.C. July 18, 2016) (using the LSI Laffey Index in FOIA case); Poulsen v. DHS, 2016 WL 1091060 (D.D.C. March 21, 2016) (using the USAO Laffey Index in a FOIA case).

"[T]his Court has, for many years, accepted the appropriateness of and greater accuracy of rates" contained in the LSI Laffey Matrix because the Court believes those rates better reflect the actual costs of litigation.  Citizens for

Responsibility & Ethics in Washington v. U.S. Dep't of Justice,
No. 11-cv-754, 2014 U.S. Dist. Lexis 182098, at *13 (D.D.C. Aug 4,
2014) (describing the methodology behind the LSI Laffey Matrix as
"far more accurate"); see also Salazar v. District of Columbia,
991 F. Supp. 2d 39, 47-48 (D.D.C. 2014) ("Salazar III") (describing
why the Court believes the methodology underlying the USAO matrix
understates inflation in the market rate for complex federal
litigation services).

However, while this Court generally believes that the LSI
Laffey Matrix is a more accurate reflection of the prevailing
market rates in complex federal litigation, in any given case the
burden is on the party seeking attorneys' fees to show that the
LSI Laffey Matrix should be used.  Salazar IV, 809 F.3d at 61.

Recently, the Court of Appeals clarified what kind of evidence
a fee applicant may use to support use of the LSI Laffey Matrix
over the USAO Laffey Matrix.  Id. at 64-65.  The Court of Appeals
upheld use of the LSI Laffey Matrix based on the submission of: 1)
an affidavit by the economist who developed the LSI Laffey Matrix,
Dr. Michael Kavanaugh; 2) billing rate tables, enabling a
comparison between law firm rates and the rates contained in each
Laffey Matrix; and 3) a survey of billing rates by law firm
partners in Washington, DC.  Id.

Subsequently, two judges in this District have also concluded
that the LSI Laffey Matrix should be used.  Citizens for

-39-

<u>Responsibility and Ethics in Washington v. U.S. Dep't of Justice</u>,
2016 WL 554772, at *1 (concluding that the LSI <u>Laffey</u> Index is
appropriate in FOIA case where the Plaintiff introduced affidavits
and billing-rate surveys and the court considered other District
Court orders); <u>see also</u> <u>Elec. Privacy Info. Ctr</u>, 2016 WL 3919810
at *3 (using LSI <u>Laffey</u> Index in FOIA case); <u>but see</u> <u>Poulsen v.</u>
<u>DHS</u>, 2016 WL 1091060 (D.D.C. March 21, 2016) (using the USAO <u>Laffey</u>
Index where case did not require creation of a <u>Vaughn</u> Index or
briefing of dispositive motions, but failing to discuss or cite to
the Circuit Court's opinion in <u>Salazar</u>).

In light of Plaintiff's submissions in this case, the Court
finds that Plaintiff has met its burden in establishing the
reasonableness of the LSI <u>Laffey</u> Index. The evidence submitted by
Plaintiff - an affidavit by Dr. Kavanaugh, billing rate tables,
and billing rate surveys - is indistinguishable from the evidence
in <u>Salazar IV</u>, and therefore, certainly allows for use of the LSI
<u>Laffey</u> index in this case. <u>See</u> 809 F.3d at 64-65; <u>see also</u> <u>Citizens</u>
<u>for Responsibility and Ethics in Washington v. U.S. Dep't of</u>
<u>Justice</u>, 2016 WL 554772, at *1 (holding that the LSI <u>Laffey</u> Index
should be used when presented with virtually identical evidence).

Furthermore, it is significant that the Government recently
conceded in another FOIA case, in which EPIC was the plaintiff,
that EPIC's attorneys were entitled to attorneys' fees based on
the LSI <u>Laffey</u> Index. <u>Elec. Privacy Info. Ctr v. DHS</u>, 2016 WL

-40-

3919810 at *3 (stating "That the parties agree that LSI Laffey Matrix acts as a starting point."). Given the very same attorneys, working for the very same organization, litigating the very same questions in both cases, it is hard to believe that the prevailing market rate would differ. Compare Exhibit G to Pl.'s Mot. ("Case Billing Record"), 12-cv-333 [Dkt. No. 81-9], with Exhibit G to EPIC's Mot. for Attorneys' Fees and Cost ("Bill of Fees and Costs"), 13-cv-260 [Dkt. No. 28-8] (both listing many of the same attorneys working on both cases).

"Once the fee applicant has provided support for the requested rate, the burden falls on the Government to go forward with evidence that the rate is erroneous. And when the Government attempts to rebut the case for a requested rate, it must do so by equally specific countervailing evidence." Covington, 57 F.3d at 1109-10 (internal quotation marks and citations omitted).

In this case, the Court concludes that the Government's evidence is insufficient. The Government's sole evidence is the declaration of the economist, Dr Laura A. Malowane. [Dkt. No. 86-4]. While Dr. Malowane offers a thoughtful methodological critique of the LSI Laffey Index, the Court remains unconvinced that the USAO Laffey Index properly accounts for inflation in the market for complex federal legal services in Washington, DC. For example, Dr. Malowane's declaration purports to show that the rates contained in the USAO Laffey Matrix are more in line with those

-41-

charged by litigation attorneys in both Washington, DC and the South Atlantic region--but that is not the relevant comparator. Id. at p. 4-7.  What is relevant is the amount of fees charged by firms or attorneys conducting complex federal litigation.  Dr. Malowane's declaration fails to establish that the firms in her sample primarily engage in such work.  Accordingly, the Government has failed to meet its burden.  See Salazar, 750 F. Supp. 2d 70, 73 (D.D.C. 2011) ("Salazar II") (explaining why the Court believes that LSI Laffey Matrix is more accurate); also Salazar III, 991 F. Supp. 2d at 47-48.

For the foregoing reasons, the Court adopts EPIC's proposal to use the hourly rates in the "LSI Laffey Index."

### 2. The reasonableness of EPIC's billing activities and hours

EPIC's Motion includes a "Bill of Fees and Costs" identifying four categories of fees that EPIC seeks: 1) fees incurred prior to the Court's Summary Judgment Order, principally in order to force DHS to produce responsive documents; 2) fee's incurred in litigating the Cross-motions for Summary Judgment; 3) fee's incurred following the issuance of the Summary Judgment Order; and 4) so-called "fees on fees," incurred in litigating the pending motion.  [Dkt. No 81-9].  The Government objects to awarding any fees whatsoever, but also raises individual objections to certain

categories of fees sought by EPIC and certain line items within
each category.

> ### a. Pre-Summary Judgment fees related to obtaining DHS's production of documents.

First, EPIC seeks fees for work conducted prior to summary
judgment - between March 1, 2012, and August 19, 2013 - to force
DHS to produce responsive documents. EPIC's Bill of Fees and Costs
claims $95,629.10 in fees, but it has discounted its claim by ten
percent for a total of $86,066.19. [Dkt. No 81-9 at p. 2]. DHS
argues that EPIC should not be awarded fees for any work it did
after the Court issued the Scheduling Order on May 24, 2012,
because that Order granted Plaintiff the only relief it received
in this case, and all subsequent work was essentially superfluous.
See Opp'n at 6 n.4.

As discussed extensively above, DHS's failure to comply with
FOIA's statutory requirements prompted EPIC to pursue litigation
in this Court and ultimately resulted in the production of more
than 1000 pages of documents. See supra 15-19. EPIC received
exactly what it sought in this lawsuit - the production of
responsive documents by DHS - and therefore, the Court will award
EPIC fees for its work that led to that production.

The Government's argument ignores that when a lawsuit
consists of related claims, "a plaintiff who has won substantial
relief should not have his attorneys' fees reduced simply because

the district court did not adopt each contention raised." Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 999 F. Supp. 2d 61, 75 (D.D.C. 2013) (quoting Hensley v. Eckerhart, 461 U.S. 424, 440 (1983)). EPIC's work prior to summary judgment was related and reasonably calculated to achieve the goal of production, and much of it was necessitated by very substantial delays by DHS after the Court issued the Scheduling Order. Even if EPIC did not prevail on every scheduling motion, the Court is mindful that "rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war." Hall v. CIA, 115 F. Supp. 3d 24, 29 (D.D.C. 2015) (quoting Air Transp. Ass'n of Canada v. FAA, 156 F.3d 1329, 1335 (D.C.Cir.1998)) (internal quotation markets omitted).

To the extent that the Government objects to individual line items for work incurred by EPIC prior to summary judgment, see Opp'n at 19, the Court declines to analyze every itemized instance of work conducted by EPIC's attorneys. The Court's role in awarding fees is to do "rough justice" not engage in a picayune "battle of the ledgers." Elec. Privacy Info. Ctr, 2016 WL 3919810 at *3-4.

EPIC has already reduced the lodestar amount for this work by 10% to account for the fact that the Court granted some of DHS's requests, Tran Decl. ¶ 10 [Dkt. No. 81-2], and therefore, the Court

finds that the hours billed for Pre-Summary Judgment Work is reasonable.

### b. Fees Incurred on Cross-Motions for Summary Judgment

The Plaintiff has also requested fees for its work on the various motions and cross-motions for summary judgment. While this work totaled $22,754.60 in fees, Plaintiff has discounted this amount by 84% for a total of $3640.74. Plaintiff asserts that it succeeded on only one of seven issues addressed in the Summary Judgment Order and this amount reflects the amount of work dedicated to that issue. Tran Decl. ¶ 11  [Dkt. No. 81-2].

"If the plaintiff achieves only limited success, it is within the court's discretion to reduce the award of fees." Hall, 115 F. Supp. 3d at 27. If a losing claim is distinct from successful claims, "the hours spent on the unsuccessful claims should be excluded in considering the amount of a reasonable fee." Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 999 F. Supp. 2d at 75 (citing Hensley v. Eckerhart, 461 U.S. at 440).

The Court will not award EPIC any fees for its work on summary judgment because, as discussed earlier, EPIC's arguments on summary judgment were wholly rejected and those claims were wholly independent from any claims on which EPIC succeeded in this litigation. EPIC did not prevail on a single issue raised on summary judgment. Furthermore, the issues that EPIC unsuccessfully

raised on summary judgment--that DHS conducted an inadequate search and that DHS improperly applied FOIA exemptions to withhold documents--are substantively unrelated to the instances in which EPIC succeeded, namely the issuance of the Scheduling Order forcing EPIC to produce responsive documents.

Everything EPIC won in this lawsuit – production of responsive documents – it won well before the issue of summary judgment came before the Court and EPIC received no further relief on the merits from the Summary Judgment Order.   Consequently, it cannot piggy back off its success prior to summary judgment to collect fees for work done preparing its opposition and cross-motion for summary judgment.

### c. Fees Incurred Post-Summary Judgment

EPIC also requests $3987.40 in fees incurred for work don't after the Court issued its Summary Judgment Order but before EPIC began litigating the issue of attorneys' fees.   The Government does not raise any specific objection to these fees. That EPIC would need to review the Court's Order and determine next steps seems reasonable to the Court.   Therefore, the Court will award fees claimed for this work.

### d. Fees on Fees

EPIC requests attorneys' fees for the time it spent litigating the present Motion for Attorneys' fees, so-called "fees on fees." This request totals $22,435.40.   The Government argues that EPIC's

request is unreasonable because EPIC spent nearly as much time on the issue of attorneys' fees as on work related to summary judgment. Def.'s Opp'n at 19.

"Hours reasonably devoted to a request for fees are compensable." Judicial Watch, Inc. v. U.S. Dep't of Justice, 878 F. Supp. 2d 225, 240 (D.D.C. 2012). "Fees on fees must be reasonable, and not excessive." Elec. Privacy Info. Ctr. v. FBI, 80 F. Supp. 3d 149, 162 (D.D.C. 2015) (internal citation and quotation marks omitted). "Courts, therefore, have an obligation to scrutinize the hours spent preparing the fee petitions to insure that the total is reasonable and that it does not represent a windfall for the attorneys." Boehner v. McDermott, 541 F.Supp.2d 310, 325 (D.D.C. 2008) (internal citation and quotation marks omitted). In addition, "fees on fees" may be reduced to reflect the degree of a plaintiff's success on the merits. See Immigration and Nationalization Services v. Jean, 496 U.S. 154, 163 n.10 (1990); see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Security, 999 F. Supp. 2d at 77.

EPIC claims 50.9 hours of fees for the present Motion. DHS argues that the hours dedicated to preparing the Motion for Attorneys' Fees are excessive. Specifically, DHS argues that EPIC spent nearly as much time on the issue of attorneys' fees as on work related to summary judgment. Def.'s Opp'n at 19; see also Elec. Privacy Info. Ctr. v. FBI, 80 F. Supp. 3d at 162 (finding

request for fees on fees in amount larger than fees for underlying FOIA action excessive).

While the Court does find it appropriate to award EPIC fees on fees, the Court agrees that EPIC's request is excessive. A fees on fees award that is roughly equivalent to the amount of time EPIC spent on summary judgment would be excessive, given that EPIC filed far fewer briefs in support of its request for attorneys' fees than on summary judgment. The excess billing stems largely from entries related to basic timekeeping, such as "review billing records" and "enter billing records," which total nearly one-third of EPIC's fees on fees request. [Dkt. No. 81-9 at p. 45-52]. EPIC had an ongoing duty throughout the litigation to maintain an accurate record of its time, which means these activities were either duplicative of work already performed or enlarged because it was performed so late in the litigation. Either way, the Court finds any total award of fees on fees for these activities to be unreasonable.

The Court does find it appropriate to award EPIC for its work attempting to resolve the issue of attorneys' fees. The Court will grant EPIC fees on fees to the extent that the work relates to settlement negotiations, and the preparation of the Motion for Attorneys' Fees. Fees related to reviewing billing and entering billing records shall be excluded.

EPIC will submit revised billing records for fees on fees to reflect this finding.

### 3. The Government's objection to EPIC's Billing Practices

Finally, the Government objects to certain billing practices of EPIC, namely billing for repetitive tasks and so-called "block billing." Opp'n at 18-19.

#### a. DHS's Claim that multiple EPIC attorneys billed for repetitive tasks.

DHS argues that the Court should reduce attorneys' fees where "multiple attorneys" conducted "routine tasks." Def.'s Opp'n at 19.

The amount of time actually expended is not the same as the amount of time reasonably expended, and the Court may reduce an award for overstaffing. Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) ("where three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time"). For example, in Elec. Privacy Info. Ctr., 72 F. Supp. 3d at 352, the Court reduced the amount EPIC could recover for triple-billing telephone conference calls because staffing telephone conferences with three attorneys was unnecessary, and accordingly reduced the lodestar for these activities to reflect the time of one junior attorney at the lowest USAO Laffey rate. Id.

Reflecting the realities of complex federal litigation and the resources of opposing counsel, the Court believes that it is often appropriate to have more than one attorney present on conference calls.  However, generally, the presence of three or more attorneys is unnecessary and unreasonable.  Elec. Privacy Info. Ctr., 72 F. Supp. 3d at 352.  Accordingly, the Court will reduce EPIC's billing entries to the extent of allowing EPIC to claim fees for at most one senior attorney and one junior attorney for participating in conference calls.

EPIC will submit revised billing records to reflect this portion of the opinion.

### b. DHS's Claim that EPIC Engaged in "Careless Errors" and Repetitive Block Billing.

DHS presents a bald assertion that EPIC engaged in "numerous examples of repetitive, block billing."  Def.'s Opp'n at 19. EPIC's billing records and affidavits provide the Court with sufficiently "contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense, 675 F.2d at 1327; see Bill of Fees and Costs, Pl.'s Ex. G [Dkt. No. 81-9] [Dkt. No. 87-2]; see also Role Models America, Inc. v. Brownlee, 353 F.3d at 975; American Immigration Council v. U.S. Dep't of Homeland Security, 82 F. Supp. 3d 396, 412 (D.D.C. 2015).  DHS has not

provided specific evidence to overcome the presumption of reasonableness.

However, in considering the parties' motions, the Court discovered one instance in which EPIC appears to have double-billed for the work of one attorney. [Dkt. No. 81-9 at p. 7] (including two entries for the participation of Marc Rotenberg in a tele-conference on May 21, 2012). As the Court has asked EPIC to submit a revised bill, EPIC will be afforded an opportunity to correct any and all errors present, including the error just identified.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Attorneys' Fees shall be **granted in part and denied in part.** EPIC shall prepare a revised case billing record in accordance with this opinion. In submitting the revised bill, EPIC shall not seek fees for any work not already included in the Bill of Fees and Costs [Dkt. No. 81-9].

Additionally, EPIC shall submit a copy of the original Bill of Fees and Costs, annotated to indicate which specific line-items are no longer being claimed in its revised bill.

Finally, the Government will be provided an opportunity to review EPIC's revised bill and present to the Court any line-items that are either clearly erroneous or otherwise inconsistent with this opinion. The Court stresses that this is not an occasion to

relitigate any issues raised in the Motion, but simply an opportunity to assist the Court in identifying fees which EPIC may not have reasonably incurred, in light of this Memorandum Opinion.

An Order shall accompany this Memorandum Opinion.

November 21, 2016

*Gladys Kessler*

Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF